[No. S129821. Aug. 8, 2005.]

SARA M., Petitioner, v.
THE SUPERIOR COURT OF TUOLUMNE COUNTY, Respondent;
TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, Real
Party in Interest.

1002

**COUNSEL**

Sara M., in pro. per.; and Janet G. Sherwood, under appointment by the Supreme Court, for Petitioner.

No appearance for Respondent.

Gregory J. Oliver, County Counsel, and Kim M. Knowles, Deputy County Counsel, for Real Party in Interest.

Kathleen Bales-Lange, County Counsel (Tulare), John A. Rozum, Chief Deputy County Counsel, Bryan C. Walters, Deputy County Counsel; and Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Real Party in Interest.

## Opinion

**CHIN, J.**—In this case, three children were removed from the custody of their mother, petitioner, Sara M. (hereafter mother), on grounds that she had failed to protect them and they had suffered serious emotional damage. (Welf. & Inst. Code, § 300, subds. (b), (c).)[1] The juvenile court declared them dependents of the court and began reunification services to try to reunite the family. After six months of reunification services, the court found that mother had failed to contact or visit the children. (§ 366.21, subd. (e).) Under section 366.21, subdivision (e), and California Rules of Court, rule 1460(f)(1)(B),[2] it terminated reunification services and scheduled a hearing to establish a permanent plan for the children. (See § 366.26.)

In this writ proceeding, mother contends that section 366.21, subdivision (e), does not permit a court to terminate reunification services after only six months due to a parent's failure to contact or visit a child, unless the child had originally been removed from the parent's custody because of abandonment. Because she did not originally abandon the children, she argues, she is entitled to a full year of reunification services before the court may begin to consider a permanent plan. She also argues that rule 1460(f)(1)(B) is invalid because it is contrary to the statute. The Court of Appeal agreed with her.

Section 366.21 can be read as mother and the Court of Appeal in this case read it. But it can also be read differently. Previous Court of Appeal decisions, as well as the Judicial Council in adopting rule 1460(f)(1)(B), have long interpreted section 366.21, subdivision (e), as permitting a court to terminate reunification services whenever a parent fails to contact or visit a child for six months after those services commenced. If this were a matter of first impression, the question would be close, but we are not writing on a clean slate. At this late date, we will not overturn the earlier appellate court decisions and the applicable rule of court.

Mother also claims her failure to contact or visit her children during this time was excusable because the Tuolumne County Department of Social Services (hereafter department) effectively prevented her from visiting them. As we explain, we disagree.

### I. Factual and Procedural History

In November 2003, the department filed juvenile dependency petitions on behalf of mother's three children, who were four, seven, and eight years old

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] All further rule references are to the California Rules of Court unless otherwise indicated.

at the time, under section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage). The petitions alleged, among other things, that mother failed to provide the children with "adequate food, clothing, and shelter," and that she was "unable to provide regular care for her children due to her substance abuse" involving crack cocaine and methamphetamine. The juvenile court detained the children. On December 9, 2003, it conducted the initial jurisdictional hearing. Mother appeared at that hearing, and the court ordered her to participate in a drug dependency program. The court set a contested jurisdictional hearing for December 30, 2003.

Mother failed to appear at the December 30 hearing, and her attorney did not know where she was. The juvenile court found it had dependency jurisdiction under section 300, subdivisions (b) and (c). It ordered reunification services, including visitation "as deemed appropriate by the case managing social worker pursuant to" section 362.1, subdivision (a), and scheduled a six-month review hearing. It also ordered mother to review, sign, and comply with the family reunification plan. On January 13, 2004,[3] mother appeared before the juvenile court sitting as the drug dependency court. She said that she had not received notice of the previous hearing by mail until after it was conducted, but she also acknowledged that the court had informed her of the hearing date when she appeared in court on December 9, 2003. At the January 13 hearing, the court ordered her to sign and comply with the family reunification case plan. She signed the plan. It required mother, among other things, to stay free from illegal drugs, to show her ability to live free from drug dependency, and to comply with all required drug tests. It conditioned her right to visit the children on her not being under the influence of alcohol or drugs and not ingesting alcohol or drugs before the visit.

Over the next six months, mother failed to comply with her drug dependency treatment and reunification plans. According to the department's six-month review report prepared in June, the only time she visited her children was on January 7. At that time, she had a "faint negative" test for methamphetamine on a presumptive test and was permitted to visit. During that visit, mother reportedly acted inappropriately and challenged the visitation rules. Consequently, the visit ended early, and the department discontinued further visits until mother agreed to abide by the visitation rules. Mother failed to appear at a court hearing on February 3, and the court issued a bench warrant. At a hearing on April 13, at which mother again did not appear, the court ordered her terminated from the dependency drug court program because she failed to participate or appear in hearings before that court.

---

[3] All further dates are in the year 2004, unless otherwise indicated.

On May 21, mother asked the department for permission to visit her children. However, she admitted she was under the influence of methamphetamine and marijuana, and she declined to take a urinalysis test. The social worker denied visitation and told her that she must test "clean" on presumptive tests to have visits rescheduled. Except for a voice mail message mother left the department a few days later stating that she had not yet decided what to do and would call again later, mother had no further contact with the department before the next court hearing on June 22.

Mother appeared at the six-month review hearing on June 22. The court told mother that it had "ordered you to do certain things, you haven't done it. There hasn't been any contact, you're not going to groups, you're not testing." It told her she had "a couple of weeks to fall in line and . . . start doing what you need to do . . . . If you don't, then the Court's going to terminate reunification services." It scheduled another hearing for July 13, and told mother to "get over to your social worker and get with this program."

A contested hearing was held on July 13, and then continued to July 15. A supplemental report the department provided for the July 13 hearing stated that on June 22, mother provided a random substance abuse test that was positive for methamphetamine. She was arrested that day for driving under the influence. She failed to take any scheduled substance abuse tests after June 22. She was arrested on June 30 for possession of a controlled substance and drug paraphernalia, although she denied that the drugs and paraphernalia were hers. On July 8, the social worker called mother and asked why she had not complied with the court's directives. Mother said after her arrest she was unable to comply. She asked to visit her children and was told she had to comply with the case plan and not be under the influence of methamphetamine for a visit to occur.

The department recommended the court terminate reunification services under section 366.21, subdivision (e), and schedule a hearing to establish a permanent plan. It also recommended the court make certain statutory findings to support these actions. The report indicated that the youngest child's grandmother wished to adopt him, and that the other two children might be placed with a grandfather.

Mother testified at the July 15 hearing. She admitted that she had signed the reunification case plan, but she said she did not fully understand it. She said she attended about three "group meetings," but then her "car had broken down and stuff like that, so I failed to go to any more." She said that if the court permitted her to participate in reunification services for the next six months, she was "hoping" that she could comply with the court's orders. She

hoped to be placed in a rehabilitation program of some kind. Accordingly, she asked for six more months of reunification services. She said that on May 21, when she asked to visit her children, she declined to take a drug test "because I told [the social worker] I was dirty for marijuana at the time." After her arrest for driving under the influence, she had no further drug testing.

At the end of the July 15 hearing, the court terminated reunification services and scheduled a hearing on November 9 to establish a permanent plan. It told mother that in June it had given her "another chance, perhaps to get into DDC [dependency drug court], to give the Court a reason to extend [reunification] services." It noted the difficulty of balancing "the time it takes for someone to actually get clean and sober and build some sort of a foundation so they can stay that way, versus . . . what's in the best interests of the children and that the children be placed . . . in an appropriate supportive living environment, a safe living environment. They just don't always mesh." It said it had no "reasonable belief that the child will be returned to [mother] in the next six months." It also made the findings the department's report recommended, including finding by clear and convincing evidence that there had been no contact between mother and the children in the last six months. In the meantime, the court ordered that the youngest child be placed with his grandmother and the other two with their grandfather.

Mother filed the instant writ petition challenging the order terminating reunification services. The Court of Appeal granted the petition. It directed the superior court to conduct a new six-month review hearing and to reinstate reunification services for an additional six months. We granted the department's petition for review.

## II. DISCUSSION

### A. *Interpretation of section 366.21, subdivision (e)*

 "California has a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. (§ 300 et seq.; [citation].) 'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52 [1 Cal.Rptr.3d 432, 71 P.3d 787].) If, after the specified time period has expired, the efforts to reunify the family have failed, " 'the court must terminate reunification efforts and set the matter for a hearing

pursuant to section 366.26 for the selection and implementation of a permanent plan. (§ 366.21, subd. (g).)' " (*Ibid.*) The hearing under section 366.26 is called a permanency planning hearing. (*In re Celine R., supra*, at p. 52.)

In this case, the court terminated reunification efforts and scheduled a permanency planning hearing. The permanency planning hearing does not necessarily result in a loss of parental rights, but it very often does. (*In re Celine R., supra*, 31 Cal.4th at pp. 52–53.) Accordingly, terminating reunification services and setting the matter for a permanency planning hearing has potentially serious consequences for a parent.

■ The issue here is whether the specified period of time in which the court must provide reunification services had expired before the court set the permanency planning hearing. Mother contends she was entitled to an additional six months of services. This is a question of statutory interpretation. Generally, subject to certain exceptions not relevant here that can extend the time period, if, as here, the child is over three years of age when removed from the home, the reunification period "shall not exceed" 12 months. (§ 361.5, subd. (a)(1).)[4] The court is also required to review the status of the child at least once every six months after the initial dispositional hearing until the matter is finally resolved. (§ 366, subd. (a)(1).) The initial six-month review hearing in this case was the one begun on June 22, then continued to July 13 and finally to July 15.

Section 366.21, subdivision (e), governs this initial six-month review hearing. The fifth paragraph of that subdivision is critical here and gives rise to the present legal dispute. It provides: "If the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence that the whereabouts of the parent are still unknown, or the parent has failed to contact and visit the child, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If the court finds by clear and convincing evidence that the parent has been convicted of a felony indicating parental unfitness, the court may schedule a hearing pursuant to Section 366.26 within 120 days."

This paragraph was interpreted in *In re Monique S.* (1993) 21 Cal.App.4th 677 [25 Cal.Rptr.2d 863] (*Monique S.*). In that case, the child was initially removed from the mother under subdivision (b), but not subdivision (g), of section 300. The mother, like mother here, argued that section 366.21, subdivision (e), permitted the court to terminate reunification services "after six months of no parental contact only for those children initially removed

---

[4] When the child is under the age of three, the maximum period of reunification services is generally six months. (§ 361.5, subd. (a)(2).)

under subdivision (g) (the parent's whereabouts are unknown)." (*Monique S.*, *supra*, at p. 682.) The court disagreed: "We interpret the Legislature's placement of the comma after the word 'unknown' to create an additional ground for setting the section 366.26 hearing, where 'the parent has failed to contact and visit the child,' regardless of the initial grounds for removal." (*Monique S.*, *supra*, at p. 682.)

The court found support for its interpretation in former rule 1460(f)(2)(A). (*Monique S.*, *supra*, 21 Cal.App.4th at p. 682.) The relevant subdivision of the rule has been renumbered, but it is still substantially identical to the rule cited in *Monique S.* Today, as relevant, it provides that the court may set the permanency planning hearing at the initial six-month review hearing if: "(A) the child was removed under section 300(g) and the court finds by clear and convincing evidence that the parent's whereabouts are still unknown; or [¶] (B) the court finds by clear and convincing evidence that the parent has not had contact with the child for six months; or [¶] (C) the court finds by clear and convincing evidence that the parent has been convicted of a felony indicating parental unfitness . . . ." (Rule 1460(f)(1).)

The *Monique S.* court noted that the "[r]ules relating to the juvenile court are 'designed to implement the purposes of the juvenile court law by promoting uniformity in practice and procedure and by providing guidance to judges, referees, attorneys . . . and others participating in the juvenile court.' (Rule 1400(b).) 'Insofar as these rules are substantially the same as existing statutory provisions relating to the same subject matter, these rules shall be construed as restatements of those statutes . . . . [¶] Insofar as these rules may add to existing statutory provisions relating to the same subject matter, these rules shall be construed so as to implement the purposes of the juvenile court law.' (Rule 1400(c)(1) & (2).) We conclude rule 1460(f)(2)(A) restates section 366.21, subdivision (e), providing three discrete grounds for setting a selection and implementation hearing after six months." (*Monique S.*, *supra*, 21 Cal.App.4th at p. 682.) The court found its "interpretation allowing the selection and implementation hearing to be set after six months of a parent's failure to contact and visit a child is consistent with the intent of the dependency scheme to provide stability for abused, neglected and exploited minors. There is no purpose served in continuing to offer services where a parent, absent extenuating circumstances, makes no effort to reach out to his or her child for six months in the dependency process." (*Id.* at pp. 682–683.)

The *Monique S.* opinion was followed, albeit without independent analysis, in *In re Tameka M.* (1995) 33 Cal.App.4th 1747, 1754 [40 Cal.Rptr.2d 64], and cited with approval in dicta in *In re David H.* (1995) 33 Cal.App.4th 368, 386, footnote 11 [39 Cal.Rptr.2d 313].

The Court of Appeal in this case disagreed with *Monique S.* It concluded that "the Legislature tied parental failure to visit or contact the child with a prior adjudication of abandonment. We believe our interpretation is sound both structurally and logically. For example, if we read the phrase 'or the parent has failed to contact and visit the child' as standing apart from a previous adjudication under section 300, subdivision (g), it would then also stand apart from the requirement of a finding under clear and convincing evidence, a result which makes no sense. Furthermore, it is not reasonable to assume the Legislature meant that a failure to contact and visit the child alone is an independent ground for advancing directly to the section 366.26 hearing when it carefully enumerated a second ground, conviction of a felony indicating parental unfitness, in a separate sentence and indicated that finding must be made by clear and convincing evidence. [¶] Therefore, we interpret section 366.21, subdivision (e) as establishing only two situations where the court can schedule a section 366.26 hearing at the six-month review: (1) when the child has been removed under section 300, subdivision (g) and the court finds by clear and convincing evidence the whereabouts of the parent is still unknown or the parent has failed to contact and visit the child; or (2) when the court finds by clear and convincing evidence the parent been convicted of a felony indicating parental unfitness. Either of these circumstances reasonably justifies accelerating the section 366.26 hearing."

■ Although the statute can be read as the Court of Appeal did here, over 15 years have passed since rule 1460 was promulgated, and 12 years have passed since *Monique S.* interpreted the statute. For several reasons, we conclude that we should not abruptly change the rule and this interpretation. Rule 1460(f)(1) is unambiguous. The Judicial Council adopted the rule "pursuant to its constitutional and statutory authority to adopt rules for court administration, practice, and procedure, not inconsistent with statute." (Rule 1400(b).) The Legislature has specifically directed the Judicial Council to "establish rules governing practice and procedure in the juvenile court not inconsistent with law." (§ 265.) "The rules have the force of statute to the extent that they are not inconsistent with legislative enactments and constitutional provisions." (*In re Richard S.* (1991) 54 Cal.3d 857, 863 [2 Cal.Rptr.2d 2, 819 P.2d 843].)

■ Ultimately, the interpretation of a statute is a legal question for the courts to decide, and an administrative agency's interpretation is not binding. (*Reno v. Baird* (1998) 18 Cal.4th 640, 660 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) Certainly the Judicial Council's interpretation of a statute, as reflected in the Rules of Court, is not binding on the courts, and we will invalidate a rule if it is contrary to statute. (*People v. Hall* (1994) 8 Cal.4th 950, 960–961 [35 Cal.Rptr.2d 432, 883 P.2d 974].) But we have also said that when a statute is susceptible of more than one interpretation, we will consider an administrative interpretation of the statute that is reasonably contemporaneous

with its adoption. (*Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 234 [5 Cal.Rptr.2d 782, 825 P.2d 767].) " 'Consistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight and will not be overturned unless clearly erroneous.' " (*Ibid.*; see also *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 [59 Cal.Rptr.2d 186, 927 P.2d 296].)

Courts have given similar deference to rules of court that the Judicial Council has promulgated. ■ In *Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630 [34 Cal.Rptr.2d 641, 882 P.2d 358], we considered a constitutional provision that was construed in a rule of court. We said that "past or contemporaneous interpretation by an administrative entity . . . of a constitutional provision it is charged with implementing, is accorded considerable weight [citation], and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized. [Citations.] The Judicial Council, as an independent agency charged with a specialized and focused task of promulgating rules . . . , is the entity ' "presumably equipped or informed by experience" ' to perform such task, and whose findings warrant deferential treatment by the court." (*Id.* at pp. 657–658; see also *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4 [260 Cal.Rptr. 253]; *Zenker-Felt Imports v. Malloy* (1981) 115 Cal.App.3d 713, 720 [171 Cal.Rptr. 482] [Judicial Council's "interpretation of the statutory term 'the time of the trial' is consequently to be accorded the benefit of the familiar rule that the contemporaneous construction of a statute by an administrative agency charged with its enforcement is entitled to 'great weight' unless it is 'clearly erroneous or unauthorized' "].)

■ In *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*), we considered in detail how much weight courts should give to administrative rules. We recognized the existence of two distinct categories of rules: quasi-legislative and interpretive. Quasi-legislative rules are those that the agency promulgates as part of the lawmaking power the Legislature has delegated to it. Judicial review of these rules is very limited. (*Id.* at pp. 10–11.) Rules that *interpret* a statute receive less judicial deference. "Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . , that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion*,

however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference." (*Id.* at p. 11.)

The rules of court that the Judicial Council adopts can fall into either category; some rules are genuine lawmaking and some are interpretive. The rule at issue here (rule 1460(f)(1)) falls within the second category; it effectively interprets section 366.21, subdivision (e). So this rule is entitled to a lesser degree of judicial deference than a rule that comes within the agency's delegated legislative power to make law. But it is still entitled to some deference. In such a case, " 'the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction.' " (*Yamaha, supra,* 19 Cal.4th at p. 12.) How much weight to give such a rule is "*situational*" and depends on a number of factors. (*Ibid.*) Factors to consider are whether the administrative interpretation is " 'contained in a regulation adopted after public notice and comment [rather than one] contained in an advice letter prepared by a single staff member' "; whether the interpretation is long-standing and has been consistently maintained; and whether the interpretation was contemporaneous with the legislative enactment of the statute being interpreted. (*Id.* at p. 13.)
"If an agency has adopted an interpretative rule in accordance with Administrative Procedure Act provisions—which include procedures (e.g., notice to the public of the proposed rule and opportunity for public comment) that enhance the accuracy and reliability of the resulting administrative 'product'—that circumstance weighs in favor of judicial deference." (*Ibid.*)

The Judicial Council's membership consists of appellate and trial judges, as well as others (Cal. Const., art. VI, § 6, subd. (a)), so it "is uniquely situated to implement the legislative policy." (*People v. Wright* (1982) 30 Cal.3d 705, 713 [180 Cal.Rptr. 196, 639 P.2d 267].) It is charged, by both Constitution and statute, with adopting rules of court. (Cal. Const., art. VI, § 6, subd. (d); § 265; see *People v. Hall, supra,* 8 Cal.4th at p. 956.) Moreover, although the Judicial Council is not subject to the Administrative Procedure Act (APA) because it is an agency in the judicial branch of state government (Gov. Code, § 11340.9, subd. (a)), its process for promulgating rules includes procedures similar to those of the APA that enhance the final product's reliability. These procedures include internal review as well as notice to the public and an opportunity for public comment whenever the proposed rule is other than a minor or technical change. (See Cal. Rules of Court, tit. 6, Jud. Admin. Rules, rules 6.13(c), 6.20, 6.22.) The Judicial Council also has standing advisory committees that advise it in areas of each committee's expertise. These standing committees are directed to "act in the best interests of the public and the entire court system." (*Id.,* rule 6.31(a).) Among the standing advisory committees is one on family and juvenile law,

which is required to have members with a wide variety of experience and perspectives. (*Id.*, rule 6.43.)

Rule 1460 was adopted contemporaneously with section 366.21, subdivision (e), and its interpretation has never changed. It was subjected to public comment and internal review. (See Judicial Council of Cal., AOC, mem. to Sup. Ct. Com. of Judicial Council re Proposed Revisions to Juvenile Ct. Rules (May 2, 1989) pp. 2, 71–73.) The Judicial Council's Advisory Committee on Juvenile Court Law considered these comments and the proposed juvenile court rules, and ultimately recommended adoption of the rules, including rule 1460. That advisory committee had 21 members, including appellate and juvenile court judges, a wide variety of public and private attorneys practicing juvenile court law and representing varying constituencies, and others involved in the juvenile court system. (Judicial Council of Cal., Ann. Rep. (1990) pp. 11, 20–21.)

 All of these circumstances support the conclusion that the formal rules the Judicial Council adopts that interpret a statute, including rule 1460, are entitled to a measure of judicial deference. Accordingly, rule 1460's interpretation of section 366.21, subdivision (e), although not binding on the courts and invalid if contrary to statute, is entitled to great weight and will be overturned only if it is clearly erroneous. (*Adams v. Commission on Judicial Performance, supra,* 8 Cal.4th at pp. 657–658; *Robinson v. Fair Employment & Housing Com., supra,* 2 Cal.4th at p. 234.) We emphasize that this is merely deference, not abdication. Statutory construction remains ultimately a matter for the courts.[5]

Another circumstance weighing against overturning rule 1460(f)(1) and *Monique S., supra,* 21 Cal.App.4th 677, is legislative acquiescence. The Legislature has amended section 366.21, as well as other closely related dependency statutes, at least once, sometimes more than once, sometimes in response to judicial rulings, virtually every year since the Judicial Council adopted rule 1460 and the Court of Appeal decided *Monique S.* (See

---

[5] The dissent argues that the Judicial Council's interpretation of section 366.21, subdivision (e), is not entitled to any deference because the section "is not a 'regulatory statute' that the Judicial Council is 'immersed in administering,' " or one of its " 'own regulation[s],' " or " 'a statute that the [Judicial Council] enforces.' " (Dis. opn., *post,* at p. 1025.) But, as noted, the Legislature has specifically directed the Judicial Council to establish rules governing practice and procedure in juvenile court (§ 265), and the Judicial Council has a standing committee of experts to assist it in this endeavor. Whether or not a court would be " '*more likely* to defer' " to an administrative interpretation of some other kind of statute (dis. opn., *post,* at p. 1025, italics added), we think it appropriate to give the Judicial Council's interpretation of this statute a measure of deference. Moreover, as discussed in the text, we are deferring to the long-standing administrative and judicial interpretation of the statute for a combination of reasons.

Historical and Statutory Notes, 73 West's Ann. Welf. & Inst. Code (1998 ed.) foll. § 366.21, pp. 401–403, and *id.* (2005 supp.) pp. 188–194; *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1457–1458 [118 Cal.Rptr.2d 118]; *Maribel M. v. Superior Court* (1998) 61 Cal.App.4th 1469, 1471–1472 [72 Cal.Rptr.2d 536].) The Legislature has been very active in this area of the law and has carefully watched judicial interpretations of these statutes. But during all this time, it has left untouched rule 1460 and *Monique S.* It has not substantially changed the paragraph from section 366.21, subdivision (e), that is at issue since its original enactment. (See Stats. 1987, ch. 1485, § 43, p. 5631.)

■ This is not just a matter of legislative inattention, which is often of little significance. In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527], we refused to overrule previous Court of Appeal interpretations of a statute for similar reasons. "During that time [in the course of judicial interpretation], the Legislature has amended California's statutes regulating competition numerous times, sometimes to overrule judicial interpretations. [Citation.] But it has left this rule intact. Legislative inaction is often not a convincing reason to refuse to change a statutory interpretation. [Citation.] Under the circumstances here, however, including the longevity of the rule and the unanimity of the decisions stating it, we believe it is up to the Legislature to change it if it is to be changed." (*Id.* at p. 178.)

Here, not only has the Legislature failed to overturn a judicial interpretation, it has failed to overturn a rule of court (rule 1460) that the Judicial Council promulgated at the Legislature's direction. (See § 265.) Because the Legislature has specifically directed the Judicial Council to promulgate these rules, we can presume it was aware of the administrative interpretation, which makes its acquiescence all the more significant. (See *Yamaha, supra,* 19 Cal.4th at pp. 21–22 (conc. opn. of Mosk, J.), and cases cited; *Robinson v. Fair Employment & Housing Com., supra,* 2 Cal.4th at p. 235, fn. 7 ["Because the Legislature authorized the FEHC to establish the system of publication in which precedential decisions are printed [citations] the Legislature now is presumed to be aware of the two administrative decisions on which the Court of Appeal relied, and thus has reason to be aware of the construction the agency placed on its own regulation."].)

■ Moreover, we agree with the court in *Monique S., supra,* 21 Cal.App.4th at pages 682–683, that its interpretation of the statute is consistent with the overall legislative intent behind the statutory scheme—to balance efforts to reunify the family with the child's need for stability. "The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a

reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) It makes sense for the Legislature to permit the court to set the permanency planning hearing if the parent has not contacted or visited the child for six months. "Childhood does not wait for the parent to become adequate." (*Id.* at p. 310.)

Mother and the Court of Appeal claim the legislative history supports their interpretation of the statute. The Court of Appeal stated that "any doubt that remains is readily clarified by express Legislative intent. Section 366.21, subdivision (e) was enacted in 1987 as part of Senate Bill No. 243 (1987–1988 Reg. Sess.), a bill intended to establish a new structure for making permanency decisions. With respect to the six-month review, the Senate Committee on Judiciary stated 'the new structure would allow a case to go directly from the 6 month review to a permanency planning hearing if the child had been abandoned or the parent was convicted of a felony which indicated parental unfitness.' (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 243, as amended Apr. 27, 1998.)"

We do not believe that this legislative analysis supports mother's position. The report is fully consistent with rule 1460(f)(1) and *Monique S.* Contrary to mother's argument, the report does not show that the Legislature intended to require that additional technical requirements for abandonment stated in different statutes be met. (Cf. Civ. Code, former § 232, subd. (a)(1), now Fam. Code, § 7822.) The author of the report may simply have considered allowing six months to pass without contacting or visiting a child to constitute a form of abandonment. A commentary noted that rule 1460(f)(1) and *Monique S.* do not require that the original jurisdictional finding be made under section 300, subdivision (g), before the court may terminate services due to the parent's failure to contact and visit the child. As explained, this rule "recognizes that a parent can abandon a child whether that parent's whereabouts is known or unknown. Either way, the effect on the child is the same." (Seiser et al., Cal. Juvenile Courts Practice and Procedure (2005 ed.) § 2.152[4][c], p. 2-293; see also Cal. Judges Benchguides, Juvenile and Family Court Procedures, Benchguide 103, Juvenile Dependency Review Hearings (CJER 2004 rev.) § 103.35, p. 103-47 ["A court may set a [section 366.26] hearing at this stage [the six-month review hearing] when the parent has failed to contact and visit the child; there is nothing to be gained in continuing to offer services when a parent makes no effort to reunify with the child for six months and there are no extenuating circumstances"], citing *Monique S., supra,* 21 Cal.App.4th 677.)

 Mother also argues the statute would violate due process if it were interpreted to permit the finding that the parent had failed to contact and visit

the child to be based on some lesser showing than clear and convincing evidence. However, rule 1460(f)(1)(B) indicates that the court must make this finding by clear and convincing evidence.

■ For these reasons, we reaffirm the long-standing administrative and judicial construction of section 366.21, subdivision (e), as permitting the court to terminate reunification services and set the matter for a permanency planning hearing whenever it finds by clear and convincing evidence that the parent has failed to contact and visit the child for six months after reunification services have begun, whether or not jurisdiction was originally asserted under section 300, subdivision (g).

B. *Application to this case*

■ Mother also argues that even if we accept the *Monique S.* interpretation of the statute, the court erred in terminating reunification services because her "failure to contact or visit the child [was] caused by the social worker's refusal to make the children available for frequent and regular visitation as required by section 362.1." *Monique S.* held that reunification services need not be continued "where a parent, *absent extenuating circumstances*, makes no effort to reach out to his or her child for six months in the dependency process." (*Monique S.*, *supra*, 21 Cal.App.4th at pp. 682–683, italics added.) The italicized words imply that reunification services must be continued if there are extenuating circumstances excusing the failure to contact and visit the children. In effect, mother argues the department's actions constitute such extenuating circumstances.

Section 362.1, subdivision (a)(1)(A), states that any order for reunification services shall provide, "[s]ubject to subparagraph (B), for visitation between the parent . . . and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." Subparagraph (B) of that subdivision provides, as relevant: "No visitation order shall jeopardize the safety of the child."

In this case, the department ended mother's visit with her children on January 7 because it found she was acting inappropriately, a finding mother has never challenged. After that, it did not permit mother to visit the children unless she was free of drugs, as the reunification plan that mother signed required. Mother failed to participate in dependency drug court and for this reason was terminated from that program. The only time before the June 22 hearing that mother asked to visit her children she was, by her own admission, under the influence of methamphetamine and marijuana, and she declined to take a random urinalysis test. She has never claimed the department refused to permit her to visit the children anytime she was free of drugs.

■ Mother may not challenge the court's order providing for reunification services because she never appealed it. Section 395 provides in relevant part: "A judgment in a proceeding under Section 300 may be appealed from in the same manner as any final judgment, and any subsequent order may be appealed from as from an order after judgment . . . ." "A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355 [113 Cal.Rptr.2d 184].) An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed. (*Ibid.*) "Permitting a parent to raise issues going to the validity of a final earlier appealable order would directly undermine dominant concerns of finality and reasonable expedition," including "the predominant interest of the child and state . . . ." (*In re Janee J.* (1999) 74 Cal.App.4th 198, 207 [87 Cal.Rptr.2d 634].) Accordingly, "By failing to appeal, [mother] has waived any complaint she may have regarding the [reunification] plan as ordered." (*In re Julie M.* (1999) 69 Cal.App.4th 41, 47 [81 Cal.Rptr.2d 354].)

■ To the extent mother challenges the department's actions, sufficient evidence supports the trial court's implicit finding that the department provided reasonable reunification services. (*In re Julie M, supra*, 69 Cal.App.4th at p. 46.) The appellate court "construe[s] all reasonable inferences in favor of the juvenile court's findings regarding the adequacy of reunification plans and the reasonableness of [the social services department's] efforts." (*Ibid.*) Here, the department merely required that mother be free of drugs and alcohol before she visited her children, as the reunification plan required. The record shows, and mother never claimed otherwise, that she has a substance abuse problem. Accordingly, requiring her to be drug and alcohol free before she could visit with her children was reasonable to protect their well-being. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1007–1008 [57 Cal.Rptr.2d 861]; see § 362.1.) "The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (c); see *In re Christopher H., supra*, at p. 1006.)

■ In this case, mother made no apparent effort after January 7 to visit her children under the reunification plan when she was free of drugs and alcohol. At the June 22 hearing, the court gave her another chance, and she still failed to visit the children. Under the circumstances, we find no error in the court's ultimate order of July 15 terminating reunification services and setting a hearing to establish a permanent plan.

III. Conclusion

We reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with this opinion.

George, C. J., Baxter, J., and Werdegar, J., concurred.

**KENNARD, J.,** Dissenting.—When a child is declared a dependent of the court (Welf. & Inst. Code, § 300)[1] and is removed from parental custody, the trial court must generally order the department of social services to provide reunification services to the parent, and the court must schedule a review hearing in six months.

Ordinarily, the department of social services must provide the parent with reunification services for one year. (§ 361.5, subd. (a)(1); Cal. Rules of Court, rule 1456(f)(1).) But at the six-month review hearing the trial court may terminate reunification services and schedule a permanency planning hearing that may forever deprive the parent of any parental rights "[i]f the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence that the whereabouts of the parent are still unknown, *or the parent has failed to contact and visit the child . . . .*" (§ 366.21, subd. (e), italics added.) At issue here is this: Does the italicized phrase apply only when the child has been removed under subdivision (g) of section 300? According to the majority, the answer is "no." I disagree.

I

In 2003, the Tuolumne County Department of Social Services (Department) filed a dependency petition alleging that the three children of Sara M. should be declared dependents under subdivisions (b) (failure to protect) and (c) (serious emotional damage) of section 300 because Sara was a drug addict who was not providing them with adequate food, clothing, and shelter. The trial court sustained the petition, ordered the Department to provide Sara with reunification services (including visitation), and scheduled a six-month review hearing for June 13, 2004. Sara's case worker told her that she had one year to complete the reunification plan, and that if she failed to do so the court would order a permanent plan that could result in termination of her parental rights. A court order and a letter to Sara from a social worker also said that she had one year to comply with the reunification plan.

Sara did not comply with the reunification program during the first six months of the dependency. She visited the children once at the beginning of

---

[1] All further statutory citations are to the Welfare and Institutions Code.

the dependency, but the visit did not go well. She tried to visit a second time shortly before the six-month review hearing, but she was not allowed to see the children after she admitted being under the influence of methamphetamine and marijuana; she was told that she could see the children only if she stopped using drugs. At the six-month review on June 22, 2004, the trial court told Sara it would terminate reunification services if she did not make a greater effort to comply with the reunification program; the court continued the matter for three weeks to check on Sara's progress.

Later that day, Sara drove to her social worker's office and submitted to a drug test; when the test was positive for methamphetamine, the social worker had Sara arrested for driving under the influence. The next week the police arrested her for possession of a controlled substance and drug paraphernalia, both misdemeanors. At the progress hearing, the trial court ordered termination of reunification services and scheduled a permanency planning hearing. Sara filed a writ petition challenging these rulings. The Court of Appeal held that the trial court's orders were premature. It directed the trial court to vacate the permanency planning hearing and to reinstate reunification services for an additional six months.

## II

A child may be made a dependent of the court for many reasons, as set forth in section 300's 10 subdivisions. Subdivisions (b) and (c), under which the dependency in this case was created, authorize a dependency when a parent has willfully or negligently failed to protect the child from abuse or to provide adequate food, clothing, and shelter (subd. (b)) and when the child has suffered or is at risk of suffering serious emotional damage (subd. (c)). Also pertinent here is subdivision (g), which authorizes a dependency when a child is left without support; when a parent voluntarily surrenders custody of a child and thereafter does not reclaim it; when a parent is incarcerated or institutionalized and cannot arrange for the child's care; and when a custodian with whom the child is living cannot or will not care for the child, the parent's whereabouts are unknown, and reasonable efforts to locate the parent are unsuccessful. Other subdivisions of section 300 authorize dependencies for physical abuse (subd. (a)), sexual abuse (subd. (d)), abuse inflicted on a young child by another person with the parent's knowledge (subd. (e)), negligently or intentionally causing the death of another child (subd. (f)), relinquishment for adoption (subd. (h)), acts of cruelty (subd. (i)), and abuse or neglect of a sibling (subd. (j)).

Once a dependency is created, the trial court must, subject to certain exceptions, provide the parents with reunification services and must schedule a review hearing in six months.

Subdivision (e) of section 366.21 (section 366.21(e)), at issue here, contains eight paragraphs, all of which pertain to the six-month review hearing. It explains that at the review hearing the trial court must return the child to the parent's custody unless it finds that doing so would be detrimental to the child, that the court must make findings justifying a continued detention of the child, and that the court must warn the parent that if return of the child is still inappropriate after an additional six months, a permanency planning hearing may be scheduled.

As a general rule, after the six-month review hearing the parent must be provided with reunification services for an additional six months. But section 366.21(e) provides that in certain circumstances, which are described in four paragraphs, the court may terminate reunification services at the review hearing. Pertinent here is one of these paragraphs, the fifth paragraph of section 366.21(e), which states: "If the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence the whereabouts of the parent are still unknown, *or the parent has failed to contact and visit the child*, the court may schedule a [permanency planning] hearing . . . within 120 days. If the court finds by clear and convincing evidence that the parent has been convicted of a felony indicating parental unfitness, the court may schedule a [permanency planning] hearing . . . within 120 days." (Italics added.)

At issue here is whether, as the Court of Appeal concluded, the italicized phrase applies only when the dependency was created under subdivision (g) of section 300, or whether, as the majority concludes, the italicized phrase applies to dependencies created under any subdivision of section 300. To answer that question, I turn to our standard rules of statutory construction. "The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' (*Ibid.*) If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls. (*In re Jennings* (2004) 34 Cal.4th 254, 263 [17 Cal.Rptr.3d 645, 95 P.3d 906].)" (*Fitch v. Select Products Company* (2005) 36 Cal.4th 812, 818 [31 Cal.Rptr.3d 591, 115 P.3d 1233].)

The majority construes the fifth paragraph of section 366.21(e) as permitting the trial court to set the matter for a permanency planning hearing in three circumstances: (1) "If the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence that

the whereabouts of the parent are still unknown," (2) "[i]f . . . the parent has failed to contact and visit the child," and (3) "[i]f the court finds by clear and convincing evidence that the parent has been convicted of a felony indicating parental unfitness." (§ 366.21(e).) So construed, there is a standard of proof (clear and convincing evidence) that the Legislature specified for the first and third of these circumstances, but not for the second. The majority offers no explanation for that legislative omission.

The Court of Appeal, by contrast, concluded that the phrase at issue in the fifth paragraph of section 366.21(e), which I italicized in my discussion at page 1009, *ante*, refers back to the beginning of the sentence, which states, "If the child was removed initially under subdivision (g) of Section 300 . . . ." Therefore, the Court of Appeal said, the italicized phrase applies only when the child was initially made a dependent under subdivision (g) of section 300. Under that interpretation, a trial court can schedule a permanency planning hearing at the time of the six-month review in two circumstances. The first has two subgroups: "If the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence [either (a)] the whereabouts of the parent are still unknown, or [(b)] the parent has failed to contact and visit the child." (§ 366.21(e).) The second circumstance occurs "[i]f the court finds by clear and convincing evidence that the parent has been convicted of a felony indicating parental unfitness." (*Ibid.*) Under the Court of Appeal's interpretation, the Legislature specified a standard of proof (clear and convincing evidence) for each of the categories listed in the paragraph at issue, whereas the majority's construction here leaves one of the categories without a standard of proof.

Furthermore, the second of the majority's three categories ("[i]f . . . the parent has failed to contact and visit the child") is so all-encompassing that it completely swallows up the first category ("[i]f the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence that the whereabouts of the parent are still unknown"), leaving the first category meaningless. Otherwise stated, if the child was initially removed because the parent's whereabouts were unknown, and the parent's whereabouts are still unknown at the trial court's six-month review, it is unlikely that the parent would have contacted or visited the child during the intervening time.

Thus, the majority's interpretation of the fifth paragraph of section 366.21(e) turns the entire first clause of the paragraph ("If the child was removed initially under subdivision (g) of Section 300 and the court finds by clear and convincing evidence that the whereabouts of the parent are still unknown") into mere surplusage. This violates "one of the guiding principles of statutory construction, that significance be accorded every word of an act."

(*People v. Johnson* (2002) 28 Cal.4th 240, 246–247 [121 Cal.Rptr.2d 197, 47 P.3d 1064].) This court has repeatedly explained that ".whenever possible, significance must be given to every word in pursuing the legislative purpose, and the court should avoid a construction that makes some words surplusage." (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 330 [87 Cal.Rptr.2d 423, 981 P.2d 52]; see also *Elsner v. Uveges* (2004) 34 Cal.4th 915, 931 [22 Cal.Rptr.3d 530, 102 P.3d 915]; *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1]; *Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 [19 Cal.Rptr.2d 882, 852 P.2d 377]; *Brown v. Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272]; *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].)

Under the Court of Appeal's statutory interpretation, by contrast, there is no surplusage. In essence, the Court of Appeal construed the first sentence of the fifth paragraph of section 366.21(e) as saying that a trial court may schedule a permanency planning hearing at the six-month review hearing if the child was removed because the parent abandoned the child and either (1) the parent's whereabouts are still unknown at the time of the review hearing, or (2) even though the parent's whereabouts have been discovered, the parent has not visited the child. These categories do not overlap, and neither is so broad that it encompasses the other.

As previously mentioned, the statutory scheme generally provides for up to one year of services designed to reunify the parent and child before a permanency planning hearing is scheduled. (§ 361.5, subd. (a)(1); Cal. Rules of Court, rule 1456(f)(1); see generally, *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248–249 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Under the majority's interpretation of the fifth paragraph of section 366.21, a trial court may end reunification services after only six months even when, as in this case, a parent whose child was removed for reasons unrelated to abandonment has shown an interest in visiting the child, but has not been permitted to do so because of a continuing substance abuse problem. This broad reading is inconsistent with the statutory scheme's general policy of giving a parent a year to meet the requirements of an individualized reunification plan. As interpreted by the Court of Appeal, however, the Legislature crafted a narrow exception to that general policy when a parent who initially abandoned the child has shown no interest in reunification (because the parent's whereabouts are unknown or the parent has not visited the child), or when a parent has been convicted of a felony that demonstrates parental unfitness. Offering an additional six months of services to such parents would be pointless, because further services would not redress the problems that resulted in the dependency. (See *Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 166 [48 Cal.Rptr.2d 669] [goal of reunification services is to "address the circumstances which required . . . court intervention into a family's life"].)

In short, the majority's interpretation of the fifth paragraph of section 366.21(e) makes one clause of the paragraph meaningless, is based on the assumption that the Legislature specified a standard of proof for two of the categories of cases discussed in the paragraph but not the third, and is inconsistent with the statutory scheme governing dependencies. By contrast, the Court of Appeal's statutory interpretation gives meaning to all of the words in the paragraph at issue, it specifies a standard of proof for each of the categories of cases discussed in the paragraph, and it is consistent with the statutory scheme. That construction far better reflects the Legislature's intent than that of the majority here.

### III

The majority's construction of the fifth paragraph of section 366.21(e) mirrors that of the Judicial Council, as reflected in rule 1460(f)(1) of the California Rules of Court. After considerable discussion of *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*), in which this court described the circumstances in which it defers to the statutory interpretations of administrative agencies, the majority concludes that the Judicial Council's interpretation, in rule 1460(f)(1), of the fifth paragraph of section 366.21(e) "is entitled to great weight and will be overturned only if it is clearly erroneous." (Maj. opn., *ante*, at p. 1014.) Applying that standard, the majority concludes that it "will not overturn" the Judicial Council's interpretation. (Maj. opn., *ante*, at p. 1005.)

*Yamaha* relied heavily on Professor Michael Asimow's views on administrative law, as expressed in a law review article (Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157 (Asimow)) and reflected in his work as administrative law adviser to the California Law Revision Commission (Cal. Law Revision Com., Tent. Recommendation: Judicial Review of Agency Action (Aug. 1995)). As pertinent here, Professor Asimow explained that in considering whether to defer to an administrative agency's determination on a question of law, courts look at certain factors to decide whether an administrative agency has a "comparative interpretive advantage over courts" (Asimow, *supra*, 42 UCLA L.Rev. at p. 1195; see also *Yamaha, supra*, 19 Cal.4th at p. 12), and the courts also look at other factors to determine whether the administrative agency's interpretation has been carefully considered and consistently maintained (Asimow, *supra*, 42 UCLA L.Rev. at pp. 1196–1198; *Yamaha, supra*, 19 Cal.4th at p. 13). As the majority here observes, the second group of factors tend to suggest deference to the Judicial Council's interpretation of the fifth paragraph of section 366.21(e). (Maj. opn., *ante*, at pp. 1013–1014.)

But the majority does not discuss the first group of factors, which I outline below and which point in the opposite direction.

In the words of Professor Asimow: "[A]gencies are often immersed in administering a particular statute. Such specialization gives those agencies an intimate knowledge of the problems dealt with in the statute and the various administrative consequences arising from particular interpretations. In contrast, a generalist court that visits a particular regulatory statute only infrequently lacks the advantage arising out of specialization. . . . [I]f by reason of expertise, specialization or both, an agency demonstrably has qualifications to interpret a particular text that are superior to the court's, deference is appropriate. [¶] . . . A court is [also] more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute . . . [and is] more likely to defer to an agency's interpretation of a statute that the agency enforces than to its interpretations of some other statute . . . ." (Asimow, *supra*, 42 UCLA L.Rev. at p. 1196, fn. omitted; see also *Yamaha, supra,* 19 Cal.4th at p. 12.)

Here, section 366.21(e) is not a "regulatory statute" that the Judicial Council is "immersed in administering." (Asimow, *supra*, 42 UCLA L.Rev. at p. 1196.) Nor does an interpretation of the statute give rise to "administrative consequences." (*Ibid.*) Nor is it the Judicial Council's "own regulation," nor is it "a statute that the [Judicial Council] enforces." (*Ibid.*) Rather, section 366.21(e) is a law pertaining to *judicial*, not administrative, proceedings. I do not question the Judicial Council's expertise in matters pertaining to judicial proceedings. But such matters also fall squarely within the scope of *this court's* expertise. Because this court's expertise in interpreting laws pertaining to judicial proceedings is equal to or greater than that of the Judicial Council, deference to the Judicial Council in such matters is unwarranted.

The majority points out that in *Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630 [34 Cal.Rptr.2d 641, 882 P.2d 358], this court said that the Judicial Council's interpretation of a constitutional provision, as reflected in its rules, should be "accorded considerable weight" and should not be rejected unless it is "clearly erroneous or unauthorized." (*Id.* at pp. 657–658.) But there the provision in question pertained to hearings before the Commission on Judicial Performance, which are administrative proceedings. Judicial Council rules are not given deference when, as in this case, they pertain to the operation of the *judicial system*, because in such matters the Judicial Council's expertise in determining the Legislature's intent does not exceed that of the appellate courts. (See, e.g., *People v. Hall* (1994) 8 Cal.4th 950, 963 [35 Cal.Rptr.2d 432, 883 P.2d 974]; *In re Robin M.* (1978) 21 Cal.3d 337, 346 [146 Cal.Rptr. 352, 579 P.2d 1]; *Polibrid Coatings, Inc. v. Superior Court* (2003) 112 Cal.App.4th 920, 923 [6 Cal.Rptr.3d 7];

*Maribel M. v. Superior Court* (1998) 61 Cal.App.4th 1469, 1476 [72 Cal.Rptr.2d 536]; *Trans-Action Commercial Investors, Ltd. v. Firmaterr, Inc.* (1997) 60 Cal.App.4th 352, 363–372 [70 Cal.Rptr.2d 449]; *California Court Reporters Assn. v. Judicial Council of California* (1996) 39 Cal.App.4th 15, 33–34 [46 Cal.Rptr.2d 44]; *In re Keisha T.* (1995) 38 Cal.App.4th 220, 235 [44 Cal.Rptr.2d 822]; *People v. Zamarron* (1994) 30 Cal.App.4th 865, 872 [36 Cal.Rptr.2d 17]; *Sadler v. Turner* (1986) 186 Cal.App.3d 245, 248–250 [230 Cal.Rptr. 561]; *Iverson v. Superior Court* (1985) 167 Cal.App.3d 544, 548 [213 Cal.Rptr. 399]; *Alsavon M. v. Superior Court* (1981) 124 Cal.App.3d 586, 594–595 [177 Cal.Rptr. 434].)

Thus, unlike the majority, I would not defer to the Judicial Council's interpretation of the fifth paragraph of section 366.21(e). Even if deference would be appropriate when two competing interpretations of a statute were equally plausible, here they are not. As I have previously explained (see pt. II, *ante*), the majority's interpretation of the statutory language at issue, which is reflected in California Rules of Court, rule 1460(f)(1) adopted by the Judicial Council, is inconsistent with the plain meaning of the statutory language. Therefore, I would reject that interpretation.

The majority also reasons that the principle of legislative acquiescence supports its interpretation of section 366.21(e). It points out that rule 1460(f)(1) of the California Rules of Court, whose interpretation of the fifth paragraph in section 366.21(e) the majority adopts here, was promulgated in 1990, and that three years later, the Court of Appeal in *In re Monique S.* (1993) 21 Cal.App.4th 677 [25 Cal.Rptr.2d 863], reached the same interpretation. Since then, the majority notes, the Legislature has often amended section 366.21, but it has left the paragraph at issue here unchanged. (Maj. opn., *ante*, at p. 1014.)

As this court has stressed in the past, "legislative inaction is indeed a slim reed upon which to lean." (*Quinn v. State of California* (1975) 15 Cal.3d 162, 175 [124 Cal.Rptr. 1, 539 P.2d 761]; see also *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873].) Section 366.21 is an exceptionally long statute that includes 39 paragraphs. In my view, the Legislature's decision to amend portions of this complex provision is not persuasive evidence that it intended to acquiesce in court rules or decisions construing other unrelated parts, such as the paragraph at issue here. (See *People v. Blakeley* (2000) 23 Cal.4th 82, 90 [96 Cal.Rptr.2d 451, 999 P.2d 675]; *People v. Morante* (1999) 20 Cal.4th 403, 429 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; *People v. Escobar* (1992) 3 Cal.4th 740, 751 [12 Cal.Rptr.2d 586, 837 P.2d 1100].)

CONCLUSION

Because Sara's three children were not made dependents under subdivision (g) of section 300, she was entitled to a year of reunification services (as mentioned in the trial court's order and in a letter to Sara from her social worker), rather than the six months allowed by the majority, before the trial court could schedule a permanency planning hearing. Thus, the trial court erred when it terminated reunification services after only six months. For the reasons given above, I would affirm the judgment of the Court of Appeal, which reversed the trial court's order terminating reunification services.

Moreno, J., concurred.