Filed 8/20/14  In re K.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re K.P., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,  Plaintiff and Respondent,  v.  T.P.,  Defendant and Appellant. | E057591  (Super.Ct.No. RIJ1200260)  O P I N I O N |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Anna M. Deckert and Carole A. Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

## I. INTRODUCTION

In this juvenile dependency case, respondent Riverside County Department of Public Social Services (DPSS), removed K.P. from her parents' home following a domestic violence incident. DPSS filed, and the trial court sustained, a juvenile dependency petition under Welfare and Institutions Code section 300.[1] K.P. was placed in foster care. At a six-month review hearing, the court found that returning K.P. to the parents' custody would create a substantial risk of detriment to K.P. and ordered her to remain in DPSS's custody, care, and control. Appellant, T.P. (Father), appealed this ruling.

Thereafter, K.P. was permitted to have an extended visit with her paternal grandmother. After the court terminated that visit and ordered K.P. be returned to DPSS's custody, Father appealed.[2]

For the reasons set forth below, we reject Father's arguments and affirm the court's orders.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father filed a third notice of appeal with respect to an order made on January 29, 2013, that he complete a psychological evaluation. This court assigned the same case number to the three appeals. In his appellate briefs, Father does not present any argument with respect to his appeal from the January 29, 2013, order. We therefore consider that appeal abandoned. (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6; *Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1754, fn. 1.)

In addition to the appeals addressed in this opinion, Father has filed notices of appeal of subsequent rulings in the underlying case. We will address those appeals in separate opinions.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[3]

A.  *Detention, Jurisdiction, and Disposition (October 2011 – April 2012)*

The mother gave birth to K.P. in October 2011.  At that time, the mother was taking methadone for treatment of a heroin addition.  K.P. was born addicted to methadone and hospitalized for the first four months of her life.

On February 12, 2012, DPSS received a referral concerning K.P. because of concerns about the mother's ability to care for K.P. due to the mother's history of heroin use.  It was also reported that Father seemed to have poor impulse control and was unable to visit K.P. in the hospital due to a scuffle with hospital security.

K.P. was discharged from the hospital on February 20, 2012.  The mother and K.P. moved in with Father at the paternal grandmother's house.  The house had an attached unit, which the paternal grandmother rented to her nephew and his fiancée.  The renters could access the paternal grandmother's house through an internal doorway.

---

[3] DPSS requested we take judicial notice of our file in a writ proceeding concerning this case and to augment the record in this case with the file from the writ proceeding.  Father opposed the request based on the rule that appellate courts review "'the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)  This rule applies in dependency proceedings.  (*Id.* at p. 405, 411-412.)  We agree with Father.  To the extent the facts disclosed by the record in the writ proceeding were not before the trial court when it made the orders that are the subjects of this appeal, they are not pertinent to our review.  Accordingly, we deny the request for judicial notice.

On March 2, 2012, DPSS received a second referral based on concerns that the mother was an active heroin user, homeless, had no income, no family support, and tried to sell baby supplies for cash. In addition, Father reportedly had violent anger issues.

During its investigation, DPSS received a third referral on March 12, 2012, based upon a domestic violence incident that day between the mother and Father in which each inflicted injuries on the other. The parents were arrested and K.P. was taken into protective custody and placed with a foster family.

According to Father, the mother was the aggressor and had threatened him with a meat fork. The mother, on the other hand, said that Father yelled at her and pushed her as she held K.P. in her arms. Father also pushed her on the bed and against a window, and tried to push her down the stairs. He punched her in her mouth, causing a laceration. Only then did the mother begin to fight back. Father chased her around the house and grabbed and choked her.

The parents told the social worker about a prior domestic violence incident that took place about one year earlier. According to Father, the mother attacked him and beat him up; he did not hit the mother. According to the mother, Father head-butted her during this incident and sat on her pelvis to prevent her from leaving the home. Father was arrested, but the charges were later dismissed.

K.P.'s paternal grandmother told the social worker that the mother and Father had a "volatile," "off and on" relationship over the preceding three years. According to the paternal grandmother, the mother was always the aggressor and Father merely tried to

4

restrain the mother from hitting him. She said the mother was easily agitated and yelled constantly at Father and blamed him for everything. She described Father as "'a good father who takes care of [K.P.]'"

On March 14 2012, DPSS filed a petition concerning K.P. under section 300, subdivisions (b) and (g). The petition was based on allegations of domestic violence and child endangerment, the parents' use of controlled substances, the failure to benefit from services, Father's prior arrest on domestic violence and drug charges, and the parents' current incarceration.

A detention hearing was held on March 15, 2012. K.P. was ordered detained from the parents. Supervised visits between K.P. and the parents were ordered to take place at least twice each week. The court authorized the paternal grandmother to be present at Father's visits.

On March 21, 2012, Father told a social worker that he wanted the paternal grandmother and a maternal aunt to be considered for placement. According to the social worker, the paternal grandmother said she was not able to care for K.P. at that time due to her limited mobility from recent hip surgery. The social worker also reported that there were no other paternal relatives available to care for K.P.

A contested jurisdictional/dispositional hearing was held on April 6, 2012. DPSS introduced the social worker's detention and jurisdictional/dispositional reports. The parents were present and represented by separate counsel. Each of their attorneys stated they had no objection to DPSS's evidence regarding jurisdiction and no affirmative

5

evidence. DPSS withdrew the allegations regarding Father's use of controlled substances and the parents' incarceration. The court found the remaining allegations true. K.P. was declared a dependent of the court and removed from the parents' physical custody. Supervised visits between the parents and K.P. were to continue at least twice per week; however, the court also authorized unmonitored day, overnight, and weekend visits at the discretion of DPSS.

DPSS was ordered to provide, and the parents ordered to participate in, reunification services. The mother's and Father's case plans called for participation in domestic violence/anger management programs and counseling. In addition, the mother was required to participate in a substance abuse program and random drug testing.

B. *Six-month Review Period (April 2012 – November 2012)*

In May 2012, the social worker referred the paternal grandmother to DPSS's relative assessment unit (RAU) to evaluate the possibility of placement with her. A home evaluation was conducted on May 21, 2012. The RAU agent informed the paternal grandmother that Father could not be living in the home and that the adults in the home needed to be live scanned. Father promptly moved out of the house and lived with friends.

The mother completed detoxification treatment in May 2012. However, shortly afterward she tested positive for opiates. She subsequently entered into an inpatient substance abuse program, but was discharged after missing curfew because she was with

6

her family as her aunt was dying. In July, she enrolled in an outpatient program and admitted recent use of heroin. She tested positive for opiates in early August 2012.

In June 2012, Father enrolled in a domestic violence program that included anger management groups and individual counseling. His anger management group counselor reported that Father "had good groups and participated in their discussions." His individual therapist recommended that Father undergo a psychological evaluation because of a possible "Thought Disorder." Shortly afterward, Father rescinded his authorization for the therapist to disclose information to the social worker. Father subsequently stopped attending classes and group counseling, and terminated his individual counseling sessions before completing them.

In August 2012, DPSS suspended Father's visits because of his "ongoing erratic behavioral issues that include threatening staff, provoking staff to hit him while holding the child in front of himself, lack of self-control and verbally abusing staff." Although he interacted well with K.P., the social worker reported that "his behavior [during visits] has deteriorated to the point where he is constantly yelling, talking to himself loudly, and making threats against the individual supervising the visits and [DPSS]." At times, he "does not appear to be aware of his own actions."

According to the social worker, Father's "main issue" has been K.P.'s diaper rash and DPSS's failure to address the issue. Father told the social worker he had prescription medication for the rash and that the foster parent was not using it. According to DPSS, K.P. had what appeared to be a "mild diaper rash" that was diagnosed as an infection

7

contracted in utero. A forensic medical examination indicated nothing abnormal and the parents were advised that K.P. might outgrow the rash. Father, however, believed the rash was due to DPSS's neglect. Father also expressed concern that K.P. was throwing up because she was not being fed a certain, special formula. The social worker reported that "doctors have told the caregiver otherwise."

Contrary to instructions from social workers, Father took pictures of K.P.'s genital area during visits and, when told to stop, said "he could do whatever he needed to document any neglect of his daughter." He accused the social workers of bias and said they would "pay by losing [their] jobs." He also spoke to 10-month-old K.P. in the presence of DPSS staff "about how they were going to get millions" due to DPSS's neglect. When he was informed that the visit would be terminated due to his "continued irrational and volatile behavior," Father told the social worker he had not "'seen hostile yet,'" argued loudly, and said "this 'was no threat, it's a promise.'"

When a visit on August 22, 2012, was terminated because Father continued to take pictures of K.P.'s "bottom," Father became irate and spent the last 10 minutes of the visit "very upset, agitated, and speaking loudly." At one point, Father reportedly held up K.P. in front of himself while attempting to provoke the social worker to hit him. After the visit, he told DPSS staff that he was going to get them fired because of their unethical treatment and for "stealing his daughter." He said that the DPSS office building would not be there in two and one-half months, said he wanted his uncle, an arson investigator, to come to the office, and, as he was leaving, told DPSS staff "to have 'sweet dreams.'"

8

A week later, near the end of the visit on August 29, 2012, Father began to take pictures of K.P.'s private area. A DPSS staff member asked Father to stop. Father continued taking pictures. He then called 911 and, yelling into the telephone, made allegations of abuse and neglect while K.P. cried uncontrollably. Holding K.P. in his arms, Father refused to return her to DPSS staff. He eventually turned K.P. over to a police officer, who handed the child to DPSS staff. Father later explained that he did not return K.P. to DPSS staff because they "were not trustworthy" and "didn't do their jobs for months in taking care of her."

The next day, August 30, 2012, DPSS applied for an order to terminate Father's visits and requested a psychological evaluation of Father. At the hearing on the application, Father testified that he had never been hostile or agitated during his visits, and never threatened or acted inappropriately towards DPSS staff. He said he was concerned about K.P.'s diaper rash and had been attempting, for more than three months, to bring that concern to DPSS's attention. In addition, he described "unexplainable" injuries, such as burn marks on K.P.'s triceps and skin that had been "clipped" and hanging off one of her fingers. He said he had a videotape showing K.P. with a runny nose, coughing, and having trouble breathing. The caregivers, he asserted, have not properly used a prescription cream he bought for K.P.'s diaper rash. He further stated he did not need a psychological evaluation; he was "crazy about [his] daughter," he explained, but "not crazy."

9

Following the hearing, the court ordered that Father's visits be reduced to one 30-minute visit each week. The court also ordered Father to undergo a psychological evaluation.

Father subsequently refused the psychological evaluation because he believed it was illegal. At one hearing, Father explained that he did not submit to a psychological evaluation "[b]ecause they haven't held up their side of the deal"; specifically, social workers "haven't provided any kind of efficient service as far as protecting a child" and "neglected my child beyond belief."

Two weeks after the court's ruling to reduce Father's visits, Father filed a request to change court order pursuant to section 388. Specifically, Father requested to have K.P. placed with him and to terminate the court's jurisdiction. He asserted that K.P. had been neglected while in foster care and that placement with him was in K.P.'s best interest. In a letter attached to the petition, Father stated that K.P. was taken from him illegally, and accused social workers of defamation, of lying and falsifying reports, and of "holding my baby girl captive, for financial gain." The court ordered a hearing on the petition to coincide with the six-month review hearing.

In September 2012, the relative assessment case concerning the paternal grandmother was closed because the renters of the unit adjoining her house did not return paperwork to obtain a criminal history exemption in a timely manner. Although our record is not clear, it appears that the criminal history consisted of unpaid traffic tickets. Shortly afterward, the paternal grandmother boarded up the doorway that had allowed the

renters to access the main unit of the house. She then requested that the relative assessment case be reopened.

The social worker decided not to reopen the relative assessment case because he believed that placing K.P. with the paternal grandmother would give Father "free access" to K.P. and "be equal to simply returning the child to the father." The paternal grandmother was, in the social worker's view, colluding with Father "to have the child placed in [Father's] care and control." The social worker also believed the paternal grandmother would "be unable to protect [K.P.] from the volatile behaviors of the father" and that K.P. would not be safe in her home.

In a report prepared for the six-month review hearing, DPSS recommended that reunification services be terminated and the court set a hearing to be held pursuant to section 366.26. According to the social worker, the mother continued to use heroin and Father had been "extremely volatile and unstable" and refused to follow through with services. DPSS also had "concerns regarding [Father's] mental health that [he] flat out refuses to acknowledge or address."

At the outset of the six-month review hearing, Father requested a *Marsden*[4] hearing, which the court granted. Following the hearing, Father was appointed new counsel. At Father's request, the court ordered that Father and K.P. have a supervised visit on their mutual birthday. The review hearing was continued.

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

Three days later, on October 12, 2012, DPSS filed an application to set aside the order for the supervised birthday visit between Father and K.P. The application was based, in part, on the argument that Father continued to be "abrasive, aggressive, disrespectful, and erratic to all involved in this case." In the social worker's view, Father was "dangerous due to his behavior which has included veiled threats," and was a "flight risk." DPSS warned that if the visit went forward, it "would be unable to guarantee the safety of both the child and [DPSS] staff."

The same day, Father filed a second section 388 petition. He again sought an order returning K.P. to his care. The petition was supported by a letter written by Father substantially similar to the one attached to his earlier petition, as well as by letters written by certain relatives, neighbors, and a "Certified Life Coach." The accompanying letters included opinions that Father was not an angry person and would "never neglect a child," he was "a supportive father" who protected K.P. and put "her well-being above everything else," and, although he "can be aggressive at times," his aggression "would never be directed toward a child." The paternal grandmother's renters stated that they were willing and able to care for K.P. at the time she was removed from the home.

Following a hearing held on October 18, 2012, the court granted DPSS's request to cancel the birthday visit scheduled for October 20, 2012, but scheduled a visit to take place later that day (October 18) and a "make up birthday visit" on October 22, 2012. The court also ordered that the paternal grandmother be allowed to visit K.P. during Father's visits. The same day, paternal grandmother filed a section 388 petition and

12

Father filed his third section 388 petition. Paternal grandmother requested that K.P. be placed with her. Father requested that the order reducing his visits be reconsidered. The court ordered a hearing on paternal grandmother's section 388 petition and Father's three section 388 petitions to coincide with the rescheduled review hearing.

The combined hearing took place over three days in November 2012. The social worker, Father, and the paternal grandmother testified. The social worker testified that the mother had not completed her substance abuse program and had only recently begun to take "her services real seriously." The mother's counsel elicited from the social worker that the mother's outpatient program counselor had informed DPSS that the mother was an active and willing participant, "pursuing recovery" and "working towards [her] treatment plan goals"; the mother had housing and was employed full time as a nurse; she had visited K.P. consistently and the visits had gone well; and that she and K.P. showed affection toward each other and shared a child/parent bond.

Regarding Father, the social worker testified about Father's behavior during visits and how they worsened over time, Father's lack of compliance with his case plan, and Father's failure to undergo the court-ordered psychological evaluation.

Regarding placement with the paternal grandmother, the social worker explained that even if the RAU approved the paternal grandmother for placement, DPSS would "probably not" have placed K.P. with the paternal grandmother because of Father's behaviors and the concern that the paternal grandmother would allow Father to have access to K.P. and fail to protect K.P.

13

The paternal grandmother testified that, contrary to DPSS reports, she had asked that K.P. remain in her home since the initial detention and could have provided for her. Although she had had recent hip surgery, there were other adults in the house who could help her if necessary. When she was informed that the relative assessment was denied because of her renters' failure to clear up traffic tickets, she boarded up the doorway connecting the house from the rental unit and asked to be reassessed. The social worker, however, never responded to her request. She insisted that she would abide by any order the court made regarding placement with her and that if Father came to the home when not permitted she would call DPSS or the "authorities."

Father testified to his concerns about K.P.'s persistent diaper rash and other ways in which he perceived K.P. was being neglected while in DPSS's custody. He described a photograph showing, in his words, "a chunk of flesh missing off of my daughter's rear end." He said he attended most, but not all, of the programs and counseling sessions called for in his case plan, and did not undergo a psychological evaluation. K.P. recognized him as her daddy and reached out for him at visits; he loved her and had a bond with her.

When the court inquired of Father about participating in a psychological evaluation, he initially indicated that he would not do so if the psychologist was chosen or paid for by DPSS. After a discussion with his counsel, he said he would participate in a psychological evaluation by a court-selected psychologist. When asked about

14

participating in court-ordered services, however, Father was equivocal and expressed his belief that counselors chosen by DPSS would be biased.

The parents (through counsel) argued in favor of granting the section 388 petitions and against DPSS's recommendation to terminate services; DPSS sought the denial of the section 388 petitions and argued in favor of terminating services. K.P.'s counsel did not take a position as to continuing services for the parents. However, based upon the evidence of K.P.'s diaper rash, K.P.'s counsel expressed strong concern for K.P.'s care in DPSS's custody and sympathetic understanding for Father's complaints and frustration.

On November 15, 2012, the court denied Father's section 388 petitions based on a failure to show either changed circumstances or that the requested changes would be in K.P.'s best interest. The court also denied the paternal grandmother's section 388 petition on the ground that DPSS did not abuse its discretion in refusing to place K.P. with the paternal grandmother. The court added, however, that the paternal grandmother "seems like a very nice lady who loves her grandchild very much" and the "Court has no objection to [DPSS] placing [K.P.] with the grandmother should [DPSS] believe that to be appropriate."

The court found that the mother's and Father's progress toward alleviating or mitigating the causes necessitating placement had been minimal due to the failure to make substantive progress in their respective case plans. The court further found that returning K.P. to the parents' custody would create a substantial risk of detriment to K.P.'s safety, protection, or physical or emotional well-being. However, the court

15

rejected DPSS's recommendation to terminate services and ordered that additional services be provided to the parents. Father's "regular visitation" was reinstated. The court further ordered Father to submit to a psychological evaluation by a specified doctor and that the mother submit to random drug testing.

Father filed a notice of appeal from the orders made on November 15, 2012.

C. *Post-six-month Review Period*

The day after the November hearing, the social worker submitted a new referral to the RAU regarding the paternal grandmother. One month later, the RAU approved of the paternal grandmother.

One month after the November hearing, the social worker reported that Father had not yet scheduled the psychological evaluation nor begun his anger management program and counseling.

The mother completed the counseling portion of her case plan, but was discharged from her outpatient substance abuse program without completing it. The program counselor suspected the mother was using drugs and reported that the mother's participation in the program was "minimal." The counselor also stated that the mother was "consistently nodding out during group discussions" and refused to state her sobriety date when asked. The counselor referred the mother "to inpatient treatment with help to stop using opiates." The social worker reported that the mother failed to drug test on one occasion and expressed concern about her sobriety. The social worker requested that the court order the mother to submit to a hair follicle test.

16

One-hour joint visits by the parents took place twice each week. The parents were appropriate and compliant. The social worker reported that the joint visits were beneficial to all three and K.P. enjoyed them more than separate visits. The social worker added: "It is clear that [K.P.] has a loving bond with both parents and they with her."

The social worker concluded that "both parents are having regular visits that are going very well . . . [and] are participating in their case plans and appear to be serious about reunifying with [K.P.]"

At a hearing held on December 20, 2012, the court ordered that K.P. have an extended visit with the paternal grandmother and authorized Father to reside in the paternal grandmother's house. Father was ordered "to continue to follow all the rules, comply with DPSS and complete the psychological evaluation." The mother was not permitted to be at the paternal grandmother's house and visits between her and K.P. were to take place at DPSS's office.

Soon after K.P. began her extended visit with the paternal grandmother, DPSS received a report that the mother was residing in the home and was "'stoned out [of] her mind.'" The mother was not found at the home during unannounced welfare checks on January 2 and 3, 2013. However, the maternal grandmother had moved into the paternal grandmother's home. K.P. appeared "happy and well adjusted" in the paternal grandmother's home and "enjoy[ed] the attention given to her from her grandmothers." The paternal grandmother reported that K.P. had not had a runny nose or diaper rash since returning to her home.

17

In early January 2013, the maternal grandmother spoke with the social worker and told him that the paternal grandmother's house was an unsafe environment for K.P. She said that Father became irate towards the paternal grandmother after learning that the paternal grandmother had signed a DPSS "safety plan." Although this safety plan is not part of our record, it apparently includes provisions preventing Father from being alone with K.P. and precluding the mother's presence in the home. Father demanded that the paternal grandmother call DPSS and retract her signature on the safety plan. If she did not, he told the paternal grandmother he would report that she rents her property to heroin addicts.

The maternal grandmother reported other incidents of Father yelling at the mother and the maternal grandmother. The maternal grandmother said she suspected Father used drugs—perhaps "speed" and heroin—and believed he was "extremely paranoid as he demands that all windows, blinds, and doors to be closed at all time[s]"; he also "would not allow the grandmother[s] to take [K.P.] into the back yard for air." Father also said he is going to put up "No Trespassing" signs and shoot people who come on his property. The maternal grandmother described a small closet in the house in which Father had hidden to avoid being found in the home.

The maternal grandmother said the mother "is a straight up addict" and heard her telling Father how she can buy shampoo that will allow her to pass a hair follicle test. The social worker reported that the mother failed to follow through with the required test.

In light of this information, DPSS applied ex parte for a warrant to remove K.P. from the paternal grandmother's home and an order terminating services as to the mother. A hearing was set at Father's counsel's request. The court directed the parents, the paternal grandmother, and K.P. be present.

At the time for the hearing, the paternal grandmother dropped Father off at court, then left with K.P. While the court waited for the paternal grandmother and K.P. to return, Father left the courthouse. Two hours after the hearing was set to begin, the paternal grandmother returned to court without K.P. or Father. The paternal grandmother said that Father was with K.P. at a gas station getting a flat tire fixed. The court expressed skepticism about the paternal grandmother's explanation for her and Father's absence, and issued an arrest warrant for Father and a protective custody warrant for K.P.

Eventually, Father was contacted by telephone from the courtroom and the conversation was transcribed by the court reporter. When the mother told Father to "come back, please," Father told the mother: "I'm not going to. Fuck those mother-fuckers. For nine months my family suffered." He indicated he was on his way to "the 60" freeway.

The court told Father: "I need you to go back to the Court house. And I need you to come back now with your child. You are just making things worse." Father responded: "I don't see how this would be in the best interest of my daughter to be in the hands of people who are evil, malicious, vindictive, driven by greed and money; people that have no idea how to take care of a child . . . ." Among other complaints Father had

19

regarding DPSS, he described the social worker as "an absolute complete false, lying, vindictive, malicious, revengeful—" before being cut off by the court. Our record of the conversation is marked at several points by the court reporter's references to Father's "[i]naudible yelling." When the court informed Father that it would issue an order for his arrest if he did not come back to the court with K.P., Father said he would "turn around right now."

When Father arrived in court, the court recalled and quashed the arrest and protective custody warrants. After hearing argument, the court told Father: "I am very disturbed by what unfolded here today. It appears to the Court that both you . . . and your mother conspired to attempt to abduct the child from the jurisdiction." The court then terminated K.P.'s extended visit with the paternal grandmother and ordered K.P. be placed in DPSS's custody. A hearing regarding the psychological evaluation was set for January 29, 2012. Father filed a notice of appeal regarding these orders.

III.  DISCUSSION

A. *Father's Argument Concerning the Failure to Advise Him of His Rights at the Jurisdictional Hearing*

Father asserts that his right to due process was violated because he was not informed of certain rights at the jurisdictional hearing. These rights are set forth in rule 5.682 of the California Rules of Court and include: "(1)  The right to a hearing by the court on the issues raised by the petition;  [¶]  (2)  The right to assert any privilege against self-incrimination;  [¶]  (3)  The right to confront and to cross-examine all witnesses

20

called to testify; [and] [¶] (4) The right to use the process of the court to compel attendance of witnesses on behalf of the parent . . . ." (Cal. Rules of Court, rule 5.682(b).) According to the rule, "the court must advise the parent" of these rights as well as read the petition to those present at the jurisdictional hearing. (Cal. Rules of Court, rule 5.682(a), (b).) Moreover, he asserts that these rights could only be waived by him personally, not through counsel.

DPSS contends that Father has forfeited this argument by failing to timely challenge the court's omission. The argument is sound. In a juvenile dependency case the appealable judgment is the dispositional order. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) Under section 395, that "judgment" "may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1).) A notice of appeal must be filed within 60 days after the court makes the appealable order. (Cal. Rules of Court, rule 8.406(a)(1).)

In this case, the jurisdictional hearing was held, and the appealable dispositional orders were made, on April 6, 2012. Father's first notice of appeal was filed in November 2012, long after the time for challenging the jurisdictional and dispositional determinations. "'[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order.' [Citation.] An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed. [Citation.]" (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.) Therefore, Father's challenges to errors

21

made at or prior to the dispositional order in this case have been forfeited by failing to file a timely appeal.

Nor does Father present any meaningful argument that that forfeiture rule should not apply in this case. Although he asserts in his opening brief that "[t]he importance of due process overrides the ordinary application of the forfeiture rule," he does not go on to explain why the forfeiture rule should be overridden in this case. Indeed, in his reply brief, Father dismisses DPSS's forfeiture argument as misplaced, stating that his argument "was not a challenge to the initial finding and removal of [K.P.], but to the subsequent finding of detriment at the six-month hearing." He points to his statement in his opening brief that "[a]lthough the initial dispositional order is not the subject of this appeal, the section 366.21, subdivision (e) finding at the November 15 hearing is. . . . Accordingly, Father may assert the insufficiency of the evidence showing detriment at that proceeding." As we understand Father's argument, it appears he is not asserting the failure to give the required advisements at the jurisdictional hearing *as grounds for reversal*, but rather that the subsequent detriment findings cannot be supported by the court's jurisdictional findings or evidence of Father's conduct prior to the jurisdictional/dispositional hearing.[5]

---

[5] Father's briefs are, however, ambiguous and seemingly contradictory on this point. On the one hand, he insists he is challenging only the orders from which he has timely appealed; on the other hand, he also argues that the failure to give the advisements at the jurisdictional hearing deprived him of his constitutional right to due process and requires reversal unless harmless beyond a reasonable doubt. To the extent he is making the latter argument, we reject it as untimely.

22

The problem with Father's argument is that it incorrectly assumes that the court based its November 15, 2012, rulings upon Father's conduct prior to the jurisdictional hearing. Father devotes a substantial portion of his briefs on arguments that the evidence supporting the initial findings was weak and insufficient, but does not refer us to any point in the record that suggests that the court based its subsequent detriment finding on the evidence presented at the earlier hearing or its jurisdictional findings. Furthermore, as we explain in the next part, there is sufficient evidence to support the court's later detriment finding without regard to the evidence supporting the jurisdictional findings. Therefore, regardless of the merits of Father's argument regarding the failure to give the required advisements and the sufficiency of the evidence at the time of the jurisdictional hearing, the argument is unavailing because the record does not establish that the court relied on its jurisdictional findings and the orders are otherwise supported by substantial evidence.

B. *The Sufficiency of the Evidence Supporting the Court's Six-month Review Orders*

At the six-month review hearing "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) The social worker has the burden of establishing that detriment. (*Ibid*.) The court shall consider the social worker's report and recommendations and "the efforts or progress, or both, demonstrated by the parent . . .

and the extent to which he or she availed himself or herself to services provided . . . ." (*Ibid*.) "The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid*.)

The juvenile court's detriment finding is reviewed under the substantial evidence standard. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) Substantial evidence "means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.] In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody. [Citation.]' [Citation.]" (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.)

There was substantial evidence presented at the six-month review hearing to support the court's detriment finding. As part of his case plan, Father was required to participate in an approved domestic violence/anger management program and participate in counseling. He was also ordered to undergo a psychological evaluation. Father enrolled in the required program and began counseling. However, it is undisputed that he stopped attending classes, terminated his counseling sessions before completing them, and refused to undergo a psychological evaluation. As stated above, such behavior constitutes prima facie evidence that returning the child to Father will create a risk of detriment. (§ 366.21, subd. (e); see also *In re Heather B.* (1992) 9 Cal.App.4th 535, 560-561 [statute creates rebuttable presumption that the failure to participate regularly in

24

court-ordered treatment programs support finding that a return to parental custody would create a substantial risk of detriment to the child].)

In addition, the record is replete with the social worker's reports of Father's hostile, oppositional, and threatening behavior, including yelling at DPSS staff in K.P.'s presence or while holding her in his arms. During one visit, Father reportedly "held up [K.P.] in front of himself while attempting to provoke [a social services assistant] to hit him . . . ." Such behavior was, in the social worker's opinion, "extremely troubling as it demonstrates inappropriate parenting ability and a lack of self-control." Although Father has generally acted appropriately toward K.P., the court could reasonably conclude that a parent who acts with the level of anger and hostility that Father displayed toward DPSS staff poses a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.

Significantly, Father's refusal to undergo a psychological evaluation undoubtedly hindered the juvenile court's ability to determine the risk of detriment and may have prevented a more favorable decision for Father. If a psychologist determined that Father's anger toward DPSS does not reflect a psychological disorder and Father poses no danger to K.P., the juvenile court's order might well have been different. In the absence of such an evaluation, however, the court could reasonably believe that Father's hostile behavior, though directed at DPSS, did pose a risk of harm to K.P.

In light of the undisputed evidence that Father stopped participating in his case plan, refused to complete a psychological evaluation, and the strong evidence of ongoing

25

anger management issues and possible psychological problems, there was sufficient evidence to support the court's detriment finding at the six-month review hearing.

C. *Appeal From Order Terminating K.P.'s Extended Visit With the Paternal Grandmother and Placing Her in Foster Care*

As described above, at a hearing on DPSS's ex parte application to remove K.P. from the paternal grandmother's home, Father left the courthouse and was eventually contacted by telephone as he was driving, with K.P. in the car, toward a freeway. Believing that Father was attempting to abduct the child from the jurisdiction, the court terminated K.P.'s extended visit with the paternal grandmother and ordered K.P. placed in DPSS's custody.

On appeal, Father concedes that abducting a child and taking her out of "the jurisdiction could be serious enough to warrant a termination of placement," but contends that "there was no substantial evidence to support such a finding." We disagree. At a time when both Father and K.P. were supposed to be in court for a hearing to determine whether K.P. would be removed from the paternal grandmother's home, Father had K.P. in a car heading away from the courthouse. When Father was contacted by telephone and asked to return to court, he responded: "I'm not going to. Fuck those mother-fuckers. For nine months my family suffered." After complaining to the court about the social worker and DPSS, as well as yelling inaudibly at times, the court informed Father that if he did not return to court with K.P., the court would issue an order to put him in jail. Only then did Father agree to return to court. Based on such evidence, the court could

26

reasonably conclude that Father was attempting to take K.P. from the court's jurisdiction. We therefore reject Father's argument.[6]

IV.  DISPOSITION

We affirm the orders made on November 15, 2012, January 14, 2013, and January 29, 2013.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

HOLLENHORST
            Acting P. J.

MILLER
            J.

---

[6] Because we affirm the court's order based on the evidentiary support for the court's attempted abduction rationale, we do not address Father's alternative argument that the order could not be supported on the ground that Father had unauthorized contact with K.P.