Filed 5/28/15  In re G.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re G.M., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TINA S.,<br><br>Defendant and Appellant. | F070018<br><br>(Super. Ct. No. JV7464)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, for Plaintiff and Respondent.

-ooOoo-

In the present dependency proceeding, minor G.M. was declared a dependent of the court.  (Welf. & Inst. Code, § 300.)[1]  On May 6, 2014, at the disposition hearing, the

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

juvenile court declined to give Tina S. (mother) reunification services and made an order setting a section 366.26 hearing. At the subsequent September 2, 2014, section 366.26 hearing, the juvenile court terminated mother's parental rights.

Mother does not make a challenge to the rulings from which she appeals. Instead, she claims she is entitled to challenge the juvenile court's earlier order denying her reunification services and setting the section 366.26 hearing because the juvenile court failed to inform her of the writ requirements for challenging the order setting a section 366.26 hearing as required.

We disagree and affirm.

## PROCEDURAL AND FACTUAL HISTORY

G.M., then 10 years old, came to the attention of the Tuolumne County Department of Social Services (department) on February 5, 2014, when it received a referral indicating mother and her husband, Bernard S. (stepfather)[2], were selling drugs, specifically that they were providing a minor with heroin. G.M. had previously been a dependent of the court from March 2004 until May 2005, when mother participated in family maintenance and he remained in her care while she participated in dependency drug court. Additionally, there had been five referrals between November 2012 and November 2013, all referencing drug use in the home and unsanitary living conditions. Mother had refused to allow the department into her home, to drug test, or to cooperate in any way with the investigations.

When the social worker investigated the current allegations on February 14, 2014, mother and stepfather came to the door, but would not open the security door and refused to come outside. Both shouted through the door at the social worker and would not allow the social worker to see G.M., but told him to tell the social worker he "was fine." Stepfather was hostile and repeatedly stated, "fuck you, I don't have to deal with you

---

[2] Neither stepfather nor G.M.'s father are parties to this appeal.

2.

people." The social worker was unable to make any determination regarding substance abuse, but noted considerable garbage and a strong odor of garbage in the yard.

The social worker subsequently discovered that mother was on probation and returned to mother's home on February 20, 2014, with two deputy sheriffs to conduct a probation search. As soon as stepfather saw law enforcement, he began to shout obscenities and refused to cooperate. When told he could be arrested for obstruction, he ran out of the house toward the officers and appeared to be reaching for the officer's gun as the officer was trying to handcuff him. The other deputy attempted to assist, and mother then tried to push both deputies away. Mother was also handcuffed and both were placed into separate vehicles. The social worker noticed what appeared to be intravenous drug use track marks on stepfather's inner arms.

Marijuana and a marijuana pipe were found in a subsequent search of mother and stepfather's bedroom. G.M.'s bed smelled strongly of dog urine. The electricity worked only in part of the house, with extension cords running to the other parts. At least three bags containing beer bottles and cans and various empty alcohol bottles were found. Once at the jail, a nylon bag containing a glass pipe with white residue and small straw commonly used for ingesting drugs was found in stepfather's pocket.

The social worker went to G.M.'s school and talked to him with a teacher present. He at first said everything at home was "fine," but then admitted that he often needed food and alluded to knowing how to "smoke drugs," something he claimed he learned in a video game. The school principal invited G.M. to go home with him until his mother was released from jail.

The following day, mother agreed to meet with the social worker but did not want to do so until February 26, 2014. According to mother, she "kicked" stepfather out of the house when she learned he had drug paraphernalia on him at the time of his arrest. At the meeting with the social worker, mother's house was in the same condition it had been in previously. Mother believed stepfather was using methamphetamine, but claimed he

3.

was only in the house on February 20, 2014, because he was helping her clean the house. Mother admitted that stepfather was verbally abusive towards her and that they argued in front of G.M., but she did not think it affected G.M. because he would go into his room when they started to argue.

According to mother, she took prescription pain medication in the past and was told by her doctor to "smoke her pills" because it was more effective and she would use less by doing so. Mother claimed to have stopped taking her pain medication, but could not say when. She claimed never to have used heroin and that she had not used methamphetamine for 13 years.

Mother agreed to do the following: to participate in safety planning; to work with Differential Response Program; to reconnect with the recovery community she had previously participated in; to attend a Narcotics Anonymous meeting; to schedule an appointment with Behavioral Health Services; to talk by phone with the Center for a Nonviolent Community; to take G.M. bowling; and to provide the social worker with her new phone numbers. Mother was asked to provide a urine sample, but said she was unable to do so then and would do so the following morning. Mother failed to show.

On March 3, 2014, mother left a voice message for the social worker saying she was going out of town and would call when she got back. She left a new phone number, but there was no messaging system and calls to mother went unanswered.

On March 5, 2014, G.M.'s school called the social worker to say that G.M. arrived late and had been left by his mother without adequate supervision. The social worker found a neighbor at mother's house who said he was providing supervision for G.M. and that mother would return March 9, 2014. Another call to mother on March 10, 2014, by the social worker went unanswered.

The school called again on March 11, 2014, to report that mother had been to the school stating her power had been shut off and asking if G.M. could stay with the principal for a week "or CPS would take him."

The social worker received an anonymous call on March 17, 2014, stating that G.M. was staying with a teacher from his school as there was no food at mother's house. According to mother's aid history and transactions, mother had used her food stamp benefits card to purchase food in Tuolumne County during the time she claimed to be out of town.

The social worker made an unannounced visit to mother on March 26, 2014. The house had a strong sewer odor. Mother said the septic tank had backed up a week earlier and they were unable to use the bathroom, but she had no money to fix it. According to mother, she was able to get the power back on, but her food stamps had run out and she was struggling to provide food. She said G.M. was staying at his teacher's house. Mother told the social worker about a recent altercation with her roommate, whom she would not name. The roommate had called law enforcement after an argument and said mother was using drugs. A search by law enforcement found drug paraphernalia, which mother claimed belonged to the roommate. Mother said law enforcement told her to keep G.M. away from the roommate, so she was glad he was at his teacher's house.

Mother tested positive for marijuana. She claimed to have a medical marijuana card, but could not locate it. She also had two prescriptions for Hydrocodone. One had been filled on March 17, 2014, for 30 pills, but was empty. She admitted the other bottle was empty as well. Mother said she was taking a large amount of pain medications in a short period of time because "it really hurts." She provided no explanation for the source of the pain.

When asked why she had not followed through with her safety plan, mother laughed and said she was "not good with plans." Mother reported that she was now two months pregnant with the neighbors' son's child and the neighbors were upset. She allowed another person, Michael G., to move into her house to protect her from the neighbors.

5.

The social worker obtained the sheriff's report for the earlier March 17 incident involving law enforcement mother had told her about, but it did not match mother's description of the events. It also revealed that stepfather had been present at the time, which mother had not mentioned.

A protective custody order was obtained April 2, 2014. Mother, who stated she had miscarried the previous day, refused to allow the department and a sheriff sergeant to enter her home. G.M., who was not home at the time, was eventually located and placed in the teacher's home.

At the April 4, 2014, detention hearing, mother requested a contested detention hearing which was set for April 8, 2014. At the initial detention hearing, mother signed and filed notification of her mailing address as being on Creekside Drive. The notice informed mother that all notices would be mailed to her at that address and that it was her responsibility to notify the court or social worker in writing of a change of address.

Mother did not appear at the contested detention hearing. Her attorney stated he had met with her the previous day and she was willing to submit to detention. G.M. was ordered to remain detained and a jurisdiction hearing set for April 29, 2014.

The report prepared in anticipation of the jurisdiction hearing was hand-delivered to mother at the Creekside address on April 25, 2014. The report stated that G.M. was residing with his teacher. Mother's criminal history included a conviction for misdemeanor driving under the influence of drugs or alcohol in February of 2007; a conviction for theft and possession of unlawful paraphernalia in 2012; and an arrest on February 20, 2014, for obstructing a peace officer; and an arrest for failure to appear on a warrant on March 17, 2014.

G.M. was interviewed on April 8, 2014, and told the social worker that the neighbor who was taking care of him when his mother was out of town was a drug dealer. G.M. was able to describe in detail what marijuana and "crack" looked and smelled like. He also described seeing a "black substance mixed with crack," which appeared "sticky."

6.

On April 18, 2014, a new social worker made an unannounced visit to mother's home. Mother told the social worker she was trying to clean up the property because she was being evicted. Mother said she would probably "camp in a tent" because she had Post Traumatic Stress Disorder (PTSD) and did not do well in a homeless shelter. Mother declined to provide a urine sample when asked to do so.

According to mother, she did not get along well with the previous social worker and she had not neglected G.M. Mother was told she had the right to contest the jurisdiction hearing and that she should contact her attorney. Mother then said her PTSD was "kicking in" and she began yelling obscenities and retreated back into the house.

G.M.'s father, Thomas M., lived in Oregon. Via a telephone conversation, he said his relationship with G.M. was "not as close as [it] should be." He stated he would like to maintain phone contact with G.M.

School staff interviewed on April 22, 2014, stated that, prior to removal, G.M. was often late as his mother had a hard time waking up in the morning. He was often hungry and the school staff often fed him. They also bought him appropriate clothing. The staff stated that, when mother came into the school, it was often very obvious that she and stepfather were under the influence.

The report recommended that neither parent be assessed for drug court at this time because of mother's pattern of resistance, uncooperative demeanor, her hostility, and her refusal to submit to drug testing. It also noted her failure to follow through on offered services.

Mother was not present at the April 29, 2014, scheduled jurisdiction hearing, but she was represented by counsel, who submitted on the evidence. Disposition was set for May 6, 2014.

The report prepared in anticipation of the disposition hearing recommended that services be denied to both mother and father pursuant to section 361.5, subdivision

7.

(b)(13).[3] Included in the report was information from the 2004 disposition report because mother failed to keep her April 23, 2014, appointment with the social worker and had had no contact with the department, despite additional attempts to contact her. The earlier report stated that mother started smoking marijuana very early and she began using methamphetamine at age 13.

On April 30, 2014, G.M.'s care provider reported that a school staff member had seen mother the day before "lying down in the driveway" of her home. She had also been seen at the "[d]ump" the day before that. When a social worker found mother at her home on May 1, 2014, she notified mother to be at court on May 6, 2014, and to call her regular social worker. Mother said "ok" and was provided a business card with the date and time of the disposition hearing written on it.

G.M. was described as smart and articulate, but having self-esteem issues. Mother had not visited G.M. since he was removed on April 2, 2014. G.M. was brought by his care provider for a visit on April 23, 2014, but mother never showed.

The report recommended that reunification services be denied mother because she had a history of chronic substance abuse; she continued to use controlled substances despite participation in drug court; she had a pattern of being evasive; she refused to drug test; she admitted overuse of prescription medication; she had a 2013 conviction for possession of unlawful drug paraphernalia; she allowed individuals to use controlled substances in her home; she refused to engage in offered services; and she herself indicated she was not capable of living a clean and sober lifestyle.

Mother did not appear at the May 6, 2014, disposition hearing. Mother was represented by counsel, who acknowledged that mother had received the disposition report. Counsel stated he had not communicated with mother since April 7, 2014, and

---

**3** Section 361.5, subdivision (b)(13) provides that reunification services need not be offered a parent who has a history of extensive, abusive and chronic drug use and has resisted prior court-ordered treatment.

submitted. The juvenile court found G.M. to be a dependent of the court and denied services to both mother and father pursuant to section 361.5, subdivision (b)(13). A section 366.26 selection and implementation hearing was set for September 2, 2014.

A blank JV-820 notice of intent to file writ petition and JV-825 petition for extraordinary writ were mailed May 6, 2014, to mother's counsel and to mother at the Creekside address. When the department attempted to serve mother with the documents personally on that same day at the Creekside address, the house was found vacant with a padlock on the door.

The report filed in anticipation of the section 366.26 hearing to be held September 2, 2014, recommended that parental rights be terminated and that G.M. be referred for adoption by his care providers, who wished to adopt him. G.M. was "okay with being adopted" if his mother was not able to care for him and wanted to stay in the home where he was placed. He knew his maternal grandmother had requested placement, but he hoped she would understand that he wanted to stay where he was. The maternal grandparents had requested placement on May 22, 2014, but withdrew their request a month later, stating it was appropriate for G.M. to remain in his current placement.

Mother visited G.M. on July 18, 2014, for the first time since detention. She visited again on August 15, 2014. She was appropriate at both visits. Father visited G.M. only once, on August 15, 2014. G.M. had ongoing contact with his maternal grandparents and his paternal grandfather and his care providers were working with a maternal aunt and uncle to arrange occasional visits.

Mother and her attorney were present at the September 2, 2014, section 366.26 hearing. Mother submitted on the report. The juvenile court found G.M. to be adoptable by clear and convincing evidence and terminated parental rights.

9.

## DISCUSSION

### I. JUDICIAL ADVISEMENT OF WRIT REQUIREMENT

Mother claims this court may reach the merits of her appeal concerning the disposition hearing because she was not properly advised of the writ requirement for challenging an order setting a section 366.26 hearing and therefore, under existing case law, her compliance with that requirement is excused. According to mother, "the hasty and improper procedures that occurred in this case fatally undermined the termination of [her] parental rights." We disagree.

Section 366.26, subdivision (*l*), provides that an order setting a section 366.26 hearing "is not appealable at any time" unless "[a] petition for extraordinary review was filed in a timely manner," the petition raised the substantive issues and they were supported by an adequate record, and the writ petition "was summarily denied or otherwise not decided on the merits." (§ 366.26, subd. (*l*)(1)(A), (B), (C); see § 366.26, subd. (*l*)(2).) This writ requirement is implemented by the California Rules of Court.[4] (See § 366.26, subd. (*l*)(3); rules 8.450 & 8.452; see also rule 8.403(b)(1).)

After the juvenile court makes an order setting a section 366.26 hearing, the court must advise all parties, including a parent, of section 366.26's requirement for filing a petition for extraordinary writ review. (Rule 5. 590(b); see § 366.26, subd. (*l*)(3)(A).) The court must give an oral advisement to parties present at the time the order is made. (Rule 5.590(b)(1); see § 366.26, subd. (*l*)(3)(A).) The court must explain that the party is required to seek an extraordinary writ by filing a notice of intent to file writ petition and request for record (form JV-820) and a petition for extraordinary writ (form JV-825). (Rule 5.590(b).) "Within one day after the court orders the hearing under … section 366.26, the advisement must be sent by first-class mail by the clerk of the court to the last known address of any party who is not present when the court orders the hearing under

---

**4**    All further rule references are to the California Rules of Court.

10.

… section 366.26." (Rule 5.590(b)(2).) Copies of form JV-825 and form JV-820 "must accompany all mailed notices informing the parties of their rights." (Rule 5.590(b)(4).)

In *In re Cathina W.* (1998) 68 Cal.App.4th 716 (*Cathina W.*), on which mother relies, the appellate court concluded that appellant mother was entitled to review of the juvenile court's order setting the section 366.26 hearing on appeal from the subsequent order terminating her parental rights at the section 366.26 hearing because mother was not duly advised of the writ requirement. (*Cathina W., supra,* at pp. 722-725.) In that case, the undelivered envelope containing the notice of intent was marked "'Return to Sender'" and had mother's new address on it, but the court clerk did not remail the notice to the mother at the new address. (*Id.* at p. 723.) In addition, the notice was sent late and the date of the setting order was misstated by four months. (*Ibid.*)

In *In re Rashad B.* (1999) 76 Cal.App.4th 442 (*Rashad B.*), the appellant mother did not appear for the continued jurisdiction/disposition hearing, at which time "the court sustained the petitions, adjudged the minors dependents, continued their placement out of home, denied reunification services to appellant pursuant to section 361.5, subdivision (b)(10)(A) and set a hearing pursuant to section 366.26." (*Id.* at p. 446.) After a section 366.26 hearing, the juvenile court terminated the mother's parental rights and referred the children for adoption. (*Rashad B., supra,* at p. 446.) On appeal from the orders following that hearing, the mother raised several alleged errors occurring during the section 366.26 hearing. (*Id.* at p. 444.)

The appellate court in *Rashad B.* found that the juvenile court did not give the mother "notice of her right to file a writ petition because the court erroneously failed to ascertain appellant's permanent mailing address (to which notice could be sent) when appellant appeared in court at the inception of the dependency." (*Rashad B., supra,* 76 Cal.App.4th at p. 444.) No advisement of writ review was sent to mother "because, in the words of the court, 'Addresses Unknown.'" (*Id.* at p. 446.) The appellate court concluded that the mother was "excused from her failure to file a writ petition, and her

11.

current claims are therefore cognizable on appeal" from orders issued after the section 366.26 hearing. (*Rashad B., supra,* at p. 444.)

*Cathina W.* and *Rashad B.* stand for the proposition that judicial error in failing to advise a party in a dependency proceeding of the writ requirement for challenging an order setting a section 366.26 hearing, that results in a failure to file a writ petition, can constitute good cause to excuse a party's failure to comply with that requirement and allow a reviewing court to reach the issues on appeal from the orders following the section 366.26 hearing. But here, the record does not demonstrate that mother's failure to comply with the writ requirement should be excused for exceptional circumstances constituting good cause.

This case is distinguishable from *Rashad B.* and *Cathina W.* This is not a case where the court failed to obtain a parent's permanent mailing address in the first place. (Cf. *Rashad B., supra,* 76 Cal.App.4th at pp. 444, 449-450.) "At the first appearance by a parent or guardian in proceedings under section 300 et seq., the court must order each parent or guardian to provide a mailing address." (Rule 5.534(m); see § 316.1, subd. (a).) A parent's designated permanent mailing address is used by the court and the social services agency for notice purposes unless and until the parent provides written notice of a new mailing address. (See § 316.1, subd. (a).) Here, mother provided her permanent mailing address when she completed form JV-140 at the time of the detention hearing on April 4, 2014, and listed the Creekside address as her mailing address. The form contained a clear advisement that all documents would be sent to that address and that mother must file a new form to notify the court or social worker of a change of permanent mailing address.

And, unlike *Cathina W., supra,* 68 Cal.App.4th at page 723, the record here discloses that the clerk of the superior court timely mailed a notice of intent to file writ packet to mother on May 6, 2014, immediately following the disposition hearing. In addition, the clerk sent a copy of the May 6, 2014, minute order which correctly stated

12.

the date of the setting order. Each was mailed to mother at the Creekside address she provided as her permanent mailing address. Accordingly, the obligation to advise mother of the writ requirement (§ 366.26, subd. (*l*)(3)(A); rule 5.590(b)) was satisfied.

Although an attempt to personally serve mother as well with the same material that same day at the address provided was unsuccessful because the "house was vacant and had a padlock on the door knob," mother's alleged failure to receive mailed notice of the writ requirement was not attributable to court error. On April 25, 2014, mother had had actual hand-delivered notice of the time and date of jurisdiction to be held April 29, 2014, but she failed to appear. And on May 1, 2014, a social worker visited mother at her home on Creekside and gave mother both an oral and a written reminder of the disposition hearing to be held May 6, 2014, but again, mother did not appear. We also note that mother was, at all times, represented by counsel, who was at all times properly noticed and present at all hearings. (See, e.g., *In re Jesusa V.* (2004) 32 Cal.4th 588, 602 [in dependency cases, appearance by an attorney is sufficient and equally effective].)

Based on the totality of facts and circumstances shown by the record in this case, there was no violation of due process or good cause for mother's failure to file a writ petition. Mother is therefore not excused from the waiver rule on that basis.

Even assuming notice to mother as to the writ requirements was lacking, it will not invalidate the proceedings if the absence of notice was harmless beyond a reasonable doubt. (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.) On the record here, there is no reason to believe that, had mother received the writ requirements, the outcome would have been different. The only hearing mother attended was the very first dependency hearing. And during the course of dependency, mother exhibited a pattern of resistance to treatment, she was uncooperative and hostile, she refused to drug test, and by the time the section 366.26 hearing was set, mother had not even visited G.M.

II. DENIAL OF REUNIFICATION SERVICES

As stated, mother's appeal also challenges the May 6, 2014, order denying her reunification services, claiming the provisions of section 361.5, subdivision (b)(13) did not apply to her. In addition, she alleges that the juvenile court failed to grant a continuance at the beginning of the disposition hearing, pursuant to section 358, subdivision (a)(3), which requires notice before a parent may be denied reunification services under section 361.5, subdivision (b).[5] But again, mother's contentions challenge a prior determination and order.

"A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1).) The notice of appeal must ordinarily "be filed within 60 days after the rendition of the judgment or the making of the order being appealed." (Rule 8.406(a)(1).)

"The dispositional order is the 'judgment' referred to in section 395, and all subsequent orders are appealable. [Citation.] '"A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." [Citation.]' [Citations.]" (*In re S.B.* (2009) 46 Cal.4th 529, 532.) Stated another way, "[a]n appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed. [Citation.]" (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.) "'Permitting a parent to raise issues going to the validity of a final earlier appealable order would directly undermine dominant concerns of finality and reasonable

---

**5** Section 358, subdivision (a)(3) provides, in pertinent part that, if the department is alleging that section 361.5, subdivision (b) is applicable, the juvenile court shall continue the proceedings for a period not to exceed 30 days; that the department shall notify the parent of the content of section 361.5, subdivision (b); and notify the parent that, if reunification services are not ordered, a permanency planning hearing will held and parental rights may be terminated within the timeframes specified by law.

expedition,' including 'the predominant interest of the child and state .…' [Citation.]" (*Ibid.*)

Because we found earlier that mother was given proper notice of the writ requirements, mother's contentions raised on appeal concerning an earlier final appealable order are not cognizable.

III.  ISSUES REGARDING SEPTEMBER 2, 2014, RULING

Mother does not assert any error concerning the September 2, 2014, order terminating her parental rights.  Thus, no cognizable issue remains for this court's review.

**DISPOSITION**

The order is affirmed.

_____
FRANSON, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
POOCHIGIAN, J.