Filed 8/31/23  In re A.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.S.,<br><br>Defendant and Appellant. | F085482<br><br>(Super. Ct. No. 14CEJ300111-2)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Kimberly J. Nystrom-Geist, Judge.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Smith, J. and Snauffer, J.

Appellant R.S. (mother) is the mother of A.S. who is the subject of this dependency case. Mother challenges two orders issued by the juvenile court following a combined hearing considering her Welfare and Institutions Code[1] section 388 petition, and a section 366.26 permanency plan for A.S. Following the hearing, the court denied mother's section 388 petition, concluded adoption was the appropriate permanent plan for A.S., and terminated mother's parental rights,[2] rejecting the applicability of the beneficial parent-child relationship exception.

## PROCEDURAL AND FACTUAL SUMMARY

On August 26, 2020, the Riverside County Department of Public Social Services (Riverside County department) received a referral alleging "caretaker absence/incapacity of [A.S.]." It was alleged that mother left A.S., who was born in October 2016, with a friend to travel on her own to Mexico after their truck broke down. At some point, the friend, who was described as paranoid, possibly due to drug use, called the police complaining that people were knocking on his door repeatedly. In fact, the friend called the police again several times and was then arrested after admitting he had been using drugs, specifically " 'crystal.' "

That same day, law enforcement was able to reach mother, who was on her way back from Mexico to pick up A.S. When initially interviewed, mother denied methamphetamine use. However, when asked to take a test, mother said she likely would be positive for methamphetamine. Mother's test results for methamphetamine were in fact positive. While mother eventually admitted she recently had relapsed and was again using methamphetamine, she emphasized she had been sober for a year prior to that time.

---

[1]   All further statutory references are to the Welfare and Institutions Code.

[2]   The presumed father, whose parental rights were also terminated, is not part of this appeal.

2

A.S.'s physical exam revealed evidence of neglect. The exam specifically showed a lack of hygiene, old wounds, tooth decay, and the existence of lice. Due to concerns about mother's judgment, her substance use, and the findings of neglect, the Riverside County department requested a protective custody warrant for A.S. on August 26, 2020. A.S. was placed into foster care on that same date.

On August 28, 2020, the Riverside County department filed a juvenile dependency petition alleging the following:

> "b-1    The mother … abuses controlled substances, including but not limited to methamphetamine. Such actions limit her ability to provide the child with adequate care, endanger the child's safety and well-being, and create a detrimental home environment.
>
> "b-2    The mother … neglected the health and safety of the child, in that she left the child in the care of [her friend], who abused methamphetamine while caring for the child. The mother knew or reasonably should have known that [her friend] abused methamphetamine and was not a safe or suitable adult to supervise the child.
>
> "b-3    The mother … lives transiently and is unable to provide the child with a stable, safe, and suitable living environment.
>
> "b-4    The mother … has neglected the hygiene and medical health needs of the child, in that the child has healing abscesses, the child has multiple scabs on her skin, the child had not bathed in quite some time, the child has tooth decay, and the child has advanced stage lice, for which the mother has not sought medical or dental treatment.
>
> "b-5    The mother … has juvenile dependency case history in Fresno County for substantiated allegations of allowing unsafe individuals access to the child's half-sibling. Current circumstances indicate the mother has failed to benefit from previous services provided to her."[3]

During a detention hearing held on August 31, 2020, mother denied the allegations of the petition. The court found the Indian Child Welfare Act (ICWA) might be applicable, and

---

[3]    An additional allegation was contained in the petition stating the presumed father was incarcerated and could not provide for A.S.'s care.

necessary notices would have to be provided. The court then made a prima facie finding, resulting in A.S. being detained from her parents. However, mother was granted supervised visits for a minimum of two hours per week.

On November 17, 2020, the Riverside County department provided ICWA notices to the Yaqui tribe. On December 2, 2020, the Riverside juvenile court ordered the case transferred to Fresno County.

The Fresno juvenile court accepted jurisdiction of the case from Riverside County on December 30, 2020, and set a disposition hearing for February 3, 2021. The hearing was continued to March 4, 2021, to give the presumed father the opportunity to be present. Before this new court date, the Yaqui tribe finally responded to the inquiries sent by the Riverside County department, stating mother, the presumed father, and A.S. were not members of the tribe and did not have applications pending with the tribe.

On February 3, 2021, the Fresno County Department of Social Services (department) filed a report recommending A.S. be declared a dependent, mother receive family reunification services, and father not be granted placement or services. The report confirmed presumed father was incarcerated in the Fresno County jail after being convicted of possession of a controlled substance while armed with a firearm. The report also revealed mother's intention to remain in a relationship with presumed father once he was released.[4] At this point, A.S. was already living in a relative's home in Fresno County pending an assessment. This report was considered by the juvenile court at the disposition hearing held on March 4, 2021, which mother attended. The court found ICWA was not applicable, and formally approved the removal of A.S. from mother's custody.

---

[4] The report includes a statement that presumed father previously sexually abused an older half sister of A.S. This statement appears to be incorrect. Presumed father's son, who shared his name, was the person who was charged with this act. Mother confirmed this fact during a prior hearing in Riverside County.

4

The department prepared a report for the six-month status review hearing, held on July 22, 2021. The report recommended A.S. should continue as a dependent of the juvenile court and mother should continue to receive family reunification services. The report noted A.S. was still in the same placement with a family member. A summary of crucial milestones was then provided. Specifically, the report noted mother was attending services on her own through Turning Point of Fresno, but failed to attend a substance use disorder evaluation scheduled on January 11, 2021, and continued to test positive for substance use or had not shown up for testing. However, the report acknowledged mother participated in a substance abuse assessment on April 13, 2021, completed a risk assessment and psychological evaluation on May 20, 2021, and a parenting program on June 23, 2021. A recommendation was made in the report that mother attend group substance abuse sessions on a weekly basis.

The report further noted that at a child family team meeting held on June 28, 2021, mother reported she had received consistent negative drug tests for the previous two months. Mother's visits with A.S. were increased one hour per week to a total of four hours per week, along with weekly phone calls. The report also noted mother continued to show a willingness to participate in the required services and was actively demonstrating what she was learning in her classes, thus making progress. Finally, the report recommended continued family reunification services for mother.

An addendum filed after the initial report was completed indicated mother had become inconsistent with her visits with A.S., and was facilitating phone visits between A.S. and presumed father although permission had not been provided for such contact. As a result, a recommendation was made that future visits be conducted at the visitation center, and not in the caregiver's home. The minute order issued after the six-month review hearing and the juvenile court's review of the report and addendum, stated mother had made significant progress but concluded that returning custody of A.S. to her would

5

pose a substantial risk of detriment and that the current placement should continue. After ordering reunification services continued, the court set a date of February 16, 2022, for the combined 12-month/18-month review.

In September 2021, mother acknowledged she had not had contact with the presumed father in over a month and understood her chances of reunifying with A.S. would be compromised if she had contact with him. As a result, the child family team agreed that mother and A.S. could proceed with unsupervised visits. In October 2021, the department social worker reminded mother that even though her visits with A.S. were now unsupervised, she was required to get permission if she intended to have anyone else participate in those visits.

In January 2022, A.S. disclosed that her mother had taken her for a visit with presumed father and had instructed her not to share this information with anyone. Mother explained she ran into presumed father while she was pumping gas. A.S.'s therapist expressed concern that mother told the child not to be honest or to hide the information. There was also information in the record about an incident in which A.S. answered mother's phone and had a conversation with presumed father. Around this period of time, A.S.'s therapist noticed A.S. seemed more fearful. After these incidents, a determination was made that all future visits had to be supervised.

The department's next report, dated February 11, 2022, was submitted to the juvenile court for the combined 12-month/18-month status review. At this point, A.S. remained in the same relative placement. The report acknowledged that mother continued to test negative in periodic drug tests. It was also reported that visits between A.S. and mother were conducted weekly and were going well.

On February 16, 2022, mother requested a contested hearing. The contested hearing was held on May 17, 2022. At the hearing on May 17, both parents appeared via

6

video[5] and were sworn in to testify about the applicability of ICWA. Mother testified she did not have American Indian heritage. Presumed father testified he believed he might have a connection to the Yaqui tribe, but on the Mexican side of the border. After reviewing the juvenile court file, the court noted that prior notices had been sent to the Yaqui tribe and that no new information had been provided requiring further inquiries. The court concluded they had met their responsibilities under ICWA to inquire and investigate.

The majority of the testimony presented at the hearing was on behalf of mother, who called presumed father to testify, as well as the assigned social worker, and mother's cousin. Finally, mother testified as part of her case-in-chief. The focus of this testimony addressed the concern that mother was improperly exposing A.S. to presumed father without permission and in violation of the reunification plan. During the social worker's testimony, there was also confirmation mother was often warned about bringing A.S. into contact with other individuals not approved in the reunification plan during unsupervised visits.

After testimony concluded, counsel for mother asked the juvenile court to continue services, arguing there was a failure to provide adequate reasonable services, or a failure to adjust those services when needed. Mother's counsel then asked that A.S. be placed with mother and that she receive family maintenance services, in recognition of her willingness to participate in whatever was needed to benefit her daughter.

When summarizing the evidence presented at the hearing, the juvenile court noted mother's biggest challenge was keeping A.S. safe and not bringing her into contact with unsafe people, even after being warned this could jeopardize her reunification with A.S. While summarizing the testimony and the various reports prepared before the hearing, the

---

**5** Mother eventually participated in the hearing in person when the court gave her that opportunity by providing a break in the proceedings.

court returned again to the basic problem presented in this matter, that mother had difficulties with establishing boundaries when it came to A.S.'s presumed father.  For example, the court provided the following summary:

> "The [c]ourt agrees with county counsel's argument, the issue is not that the mother's home was previously unsafe or it lacks a gate, it is the mother who drives the child to the father.  It is the mother who provides access to the child for the father, whether the mother takes the child to the father's house—and the testimony is conflicting.  The father said it never happened.  I think the cousin said it did happen three times, but the cousin's testimony was kind of all over.  The mother said it happened once, but the child didn't go in.  The child disclosed it on more than one occasion, but did indicate that she had gone inside and seen the house."

Recognizing they had reached the 18-month point and that decisions had to be made on a future placement for A.S., the court concluded:

> "The mother has not demonstrated the protective capacity in that she has instructed the child to keep secrets.  The mother has not demonstrated a protective capacity in that she questions the child about the child's statements in violation of court orders and in violation of the lessons the mother would have learned in her parenting program.  It is not a question of whether or not the mother should have completed more classes.  It is a question of whether the mother can keep A[.S.] safe, be protective by keeping her away from unsafe people and allow A[.S.] the freedom to report things that frighten her to people that could help her."

The court found by clear and convincing evidence that reasonable services had been provided to mother, terminated mother's reunification services, set a date for the section 366.26 hearing, and ordered the department to prepare a permanent plan recommending adoption, legal guardianship, or foster home placement.

The report prepared for the section 366.26 hearing, initially set for September 7, 2022, noted A.S. was in good health and was developmentally on track.  The report further noted A.S. was in therapy and was making progress.  A.S.'s therapist stated the child appeared to shut down or change the subject when the topic of not returning to her mother's care was discussed.  A.S.'s relative caregivers expressed their commitment to

8

provide a permanent plan of adoption for A.S. The report acknowledged mother had consistently participated in scheduled supervised visits with A.S., and that those visits were generally beneficial. However, after discussing the relationship A.S. had developed with her caregivers and their extended family, the report concluded A.S.'s relationship with her caregivers outweighed the relationship she had with her birth parents. While ultimately recommending a permanent plan of adoption for A.S., the report also noted a post adoption contract was finalized and signed on July 28, 2022, by all parties involved, providing for monthly visits, and specifically highlighting the fact mother would be invited to share special occasions with A.S.

On September 7, 2022, mother requested the section 366.26 hearing considering the recommendation of adoption be set for trial. Thereafter, on November 14, 2022, mother filed a section 388 petition for modification, asking that reunification services be provided for an additional six months. The court scheduled a hearing on mother's petition for December 5, 2022.

On December 5, 2022, the court considered both the section 388 petition seeking a modification of the court's earlier decision to pursue a permanent placement for A.S., as well as the section 366.26 contested trial on the permanent placement plan. After making further inquiries to confirm there had been compliance with ICWA, the court took testimony from A.S., mother, and presumed father. Because mother is the only party appealing the decision of the juvenile court, this summary will focus only on the testimony relevant to her parental rights.

A.S., who was six years old at the time of the contested hearing, testified that she loved her mother and described the "fun" activities they engaged in when they were together. A.S. stated she always looked forward to visits with her mother. A.S. expressed that she wanted to live with her current caregivers forever. When asked if she

would like to live there or with her mother, A.S. responded, "I would rather be with my mom and my auntie." A.S.'s great-aunt is her current caregiver.

Upon the conclusion of the evidence, the parties made their arguments to the juvenile court on both the section 388 modification petition and the section 366.26 permanency plan. First, mother requested her section 388 modification petition be granted and that further reunification services be provided because she had made consistent efforts to address the problems resulting in A.S. being taken out of the home. With respect to the section 366.26 petition, mother asked the court not to order a permanent plan of adoption, as she had a beneficial parent-child relationship with A.S., the loss of which would be detrimental to A.S. The court continued the matter to December 19, 2022, at which time rulings on both petitions would be provided.

On that date, when addressing mother's section 388 petition, the juvenile court noted mother was required to show a change of circumstances and not simply ask for a reconsideration of the prior court order setting a section 366.26 hearing. The court concluded mother had not met her burden of showing there had been a change in circumstances. After also concluding it could not find the request for a modification would be in A.S.'s best interest, the court denied mother's section 388 modification petition.

After again confirming that ICWA requirements had in fact been met, the juvenile court turned its attention to the section 366.26 portion of the hearing. The court found A.S. was adoptable, both "generally and specifically." Addressing the section 366.26, subdivision (c)(1)(B)(i) exception to termination of parental rights, the court found mother had consistently visited with A.S. The court also found there was some incidental benefit to A.S. in the relationship she had with her parents. The court then found that while there would be a loss to A.S. if parental rights were terminated, that loss did not outweigh the benefit of stability provided to A.S. of living with a forever family, the

10

people she now defined as her family. The court, therefore, concluded the parents had not met their burden of proving the beneficial parent-child exception applied. As a result, the court found adoption was the appropriate permanent plan for A.S. and terminated parental rights.

Mother filed a timely notice of appeal challenging these findings by the juvenile court.

## DISCUSSION

The focus of mother's appeal is on the section 388 petition for modification. Mother contends the failure to grant that petition was legally flawed and improperly impacted the court's decision at the section 366.26 hearing finding adoption was the appropriate permanent plan for A.S.

## I. The Section 388 Petition Seeking Modification

### A. The Applicable Law and the Standard of Review

"Any parent or other person having an interest in a child who is a dependent child of the juvenile court[,] … *upon grounds of change of circumstance or new evidence*, [may] petition the court in the same action in which the child was found to be a dependent child of the juvenile court … for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1), italics added.) "The petitioner requesting the modification under section 388 has the burden of proof." (Cal. Rules of Court, rule 5.570(h)(1).) The party seeking a modification under section 388 has the burden of establishing "by a preponderance of the evidence that a change of circumstances exists and the proposed change is in the child's best interests." (*In re M.V.* (2006) 146 Cal.App.4th 1048, 1057.)

A petition for modification is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

11

" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Id.* at pp. 318–319.) A court exceeds the bounds of reason " ' "by making an arbitrary, capricious or patently absurd determination." ' " (*Id.* at p. 318.)

## B.      Application

Again, when ruling on mother's section 388 petition, the juvenile court recognized mother seemed to be seeking a reconsideration of the court's ruling in May 2022, setting a section 366.26 hearing. Mother's specific request for an additional six months of reunification services was also rejected as not in A.S.'s best interest given her age and the need for stability in her life after already spending one-third of her life living away from her mother.

Mother was required to show by a preponderance of the evidence that a change in circumstances existed and that this change served the best interest of A.S. (See *In re M.V.*, *supra*, 146 Cal.App.4th at p. 1057.) The evidence mother presented showed she was still working toward becoming a better parent and sought more time with the benefit of reunification services before her parental rights could be terminated. The fact circumstances might change or are changing for the better, " 'does not promote stability for the child or the child's best interests. [Citation.] " '[C]hildhood does not wait for the parent to become adequate.' " ' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206. )

Based on our review of the court's ruling on the section 388 petition, we cannot conclude the court abused its discretion. The decision was within the "bounds of reason" while contemplating the best interests of A.S. (See *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

12

**II.    The Section 366.26 Hearing Terminating Mother's Parental Rights**

**A.    The Applicable Law and the Standard of Review**

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).)  At that stage, 'the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.'  (*In re Marilyn H*., at p. 305.)"  (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)

Because the overriding concern is to protect the child, if the designated time period has expired and the efforts to reunify the family have failed, a juvenile court must move toward selecting and implementing a permanent plan for the child under section 366.26.  (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1008–1009.)  However, relevant to our inquiry, section 366.26, subdivision (c)(1)(B)(i) provides an exception "where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' "  (*In re J.D.*, *supra*, 70 Cal.App.5th at p. 620.)  This is often referred to as the "beneficial parent-child relationship exception."

The leading case defining this exception is *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).  The *Caden C.* court stated there are three elements a parent has the burden to prove by a preponderance of the evidence to justify the application of the beneficial parent-child relationship exception:  (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Id*. at pp. 632–633, 636.)

The first element of this test asks a court the "straightforward" question of whether the parent visited consistently, to "the extent permitted by court orders."  (*Caden C.*,

*supra*, 11 Cal.5th at p. 632.) The focus of this element is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid*.)

The second element of the test asks "whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus again should be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

Finally, when considering the third element, courts are required to ask "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severing the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid*.) In contrast, an adoptive home might provide a new source of stability that alleviates "emotional instability and preoccupation," making the loss "not, at least on balance, detrimental." (*Ibid*.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.)

Appellate courts review a juvenile court's ruling on the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) The substantial evidence standard applies to the first two elements of regular visitation and the existence of a beneficial parent-child relationship. (*Id*. at pp. 639–640.) The

14

court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review for a court's determination that a parent did not meet his or her burden to prove the beneficial parent-child relationship exception before terminating parental rights is "whether the evidence compels a finding in favor of the [parent] as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Specifically, the question is "whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, at p. 1528.)

## B.     Application

Our review of the record reveals substantial evidence supports the first two elements of the beneficial parent-child relationship exception. Mother, for the most part, consistently visited A.S. as allowed by the reunification plan, even after the decision was made by the court to set a hearing under section 366.26 for a permanent plan. With respect to the second element, there is also substantial evidence supporting the conclusion A.S. would benefit from continuing her relationship with mother. In her testimony, A.S. expressed how happy those visits made her feel and how she looked forward to the activities she engaged in with mother.

However, when moving on to the third element, we cannot conclude the juvenile court abused its discretion when finding the beneficial parent-child relationship exception did not apply. The court stated its belief that the benefits and stability that adoption by

15

her caregivers would provide to A.S. would not be overcome by any detriment resulting from the termination of mother's parental rights. The court cited the fact A.S. had experienced stability in her current placement for approximately two years and was doing well, not having to worry about removal, or that the placement would be challenged, even though there was an obvious loving relationship between A.S. and mother. The court then concluded clear and convincing evidence showed it was likely A.S. would be adopted, and that adoption was the appropriate permanent plan for A.S.

While section 366.26, subdivision (c)(1)(D) requires the court to " 'state its reasons in writing or on the record' " in concluding that termination of parental rights would be detrimental to the child, the court is not required to recite specific findings when it concludes that terminating parental rights would not be detrimental to the child. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Although a trial court's statement of its findings for its decision may be helpful when conducting appellate review, it is not a legal requirement. (*Ibid*.) We do not presume the court erred. Absent an affirmative showing of error by mother, we must indulge every presumption to uphold the judgment. (*In re A.L.*, at p. 1161.)

Based on the record provided in this case, including mother's history during the period of reunification, the fact A.S. had already spent one-third of her very young life in a consistent placement at the time of the section 366.26 hearing, and because her caregivers were committed to providing a permanent plan of adoption, we cannot conclude the juvenile court abused its discretion when terminating mother's parental rights. Under these circumstances, the court's ruling is entitled to a presumption of correctness and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) We cannot conclude mother was entitled to a finding in her favor on the termination of her parental rights as a matter of law. (See *In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

16

## DISPOSITION

The order denying mother's section 388 petition for modification and the order terminating mother's parental rights are affirmed.